**Miles BRICE and Leon Caulk, Defendants Below, Appellants,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 468, 2002.**

Supreme Court of Delaware.

Submitted: Nov. 26, 2002.
Decided: Jan. 16, 2003.

**4.** 110 F.Supp.2d 259 (2000).

Joseph A. Gabay, Wilmington and Neil R. Lapinski, Swartz, Campbell & Detweiler, Wilmington, for Appellant Miles Brice.

Kevin J. O'Connell, Wilmington, for Appellant Leon Caulk.

**1.** 73 *Del. Laws* c. 423. (2002), S.B. 449.

William M. Kelleher, Deputy Attorney General, Department of Justice, Wilmington, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER, and STEELE, Justices, constituting the Court En Banc.

WALSH, Justice:

Defendants Miles Brice ("Brice") and Leon Caulk ("Caulk") (collectively the "Defendants") await trial for first-degree murder, and the State intends to seek the death penalty as to each of them. In light of the United States Supreme Court's decision in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and the General Assembly's subsequent amendment to 11 *Del. C.* § 4209[1] (the "2002 Statute"), we accepted four certified questions pursuant to Supreme Court Rule 41. *Brice and Caulk v. State,* No. 468, 2002, Walsh, J. (August 30, 2002).

The Defendants have been indicted for two murders that occurred prior to the United States Supreme Court's decision in *Ring* and the General Assembly's 2002 amendment to Section 4209. The Defendants argue, on various grounds, that the 2002 Statute is inapplicable to them. After extensive briefing and argument on the certified questions, however, we conclude that Section 4209 is valid and fully applicable to the Defendants. We address each of the certified questions below.

## I.

We accepted the following questions of law that were certified to us by the Superior Court:

1. Are the Amendments contained in S.B. 449, 73 *Del.Laws* c. 423, to Delaware's death penalty statute procedural

in nature and therefore not in violation of the *ex post facto* clause of the United States Constitution, Art.1, Section 10? *Cf. State v. Cohen,* 604 A.2d 846 (Del. 1992).

2. Does the decision of the United States Supreme Court in *Ring v. Arizona* require that a jury first find the existence of any specific non-statutory aggravating factor before it may be considered by the trial judge?

3. Does the decision of the United States Supreme Court in *Ring v. Arizona* require that a jury must find beyond a reasonable doubt that all aggravating factors found to exist outweigh all mitigating factors found to exist?

4. In the penalty hearing, authorized by 11 *Del. C.* § 4209(e)(2), may the court constitutionally direct a verdict as to those statutory aggravating circumstances that are necessarily established by conviction of the offenses charged?

### A.

The constitutional validity of 11 *Del. C.* § 4209, as enacted in 1991, was called into question following the decision in *Ring.* The Arizona statute at issue in *Ring* permitted the trial judge alone to find the existence of an aggravating factor necessary for the imposition of the death penalty. *Ring,* 536 U.S. at ———–——, 122 S.Ct. at 2434–35. In holding that the Sixth Amendment to the United States Constitution (hereinafter the "Sixth Amendment") required the jury to make such a finding, the Court attempted to resolve the conflict between *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), and *Apprendi v. New*

*Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

In *Walton,* the Court stressed that the Constitution " 'does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury.' " *Walton,* 497 U.S. at 648, 110 S.Ct. 3047 (quoting *Hildwin v. Florida,* 490 U.S. 638, 640–641, 109 S.Ct. 2055, 2057, 104 L.Ed.2d 728). The Court reasoned that the Sixth Amendment does not require a State "to denominate aggravating circumstances 'elements' of the offense or permit only a jury to determine the existence of such circumstances." *Walton,* 497 U.S. at 649, 110 S.Ct. 3047. Ten years later, however, the Court announced a markedly different rule in *Apprendi* holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348. The Court did not, however, expressly overrule *Walton* in its *Apprendi* decision.[2] *Ring* resolved this inconsistency by "overrul[ing] *Walton* to the extent that it allows a sentencing judge, *sitting without a jury,* to find an aggravating circumstance necessary for imposition of the death penalty." *Id.* at 2443 (emphasis supplied).

### B.

■ The United States Supreme Court designated Delaware's capital sentencing scheme as a "hybrid system," *Ring,* 536 U.S. at ——— n. 6, 122 S.Ct. at 2442 n. 6, and thus distinguished our system from Arizona's. The hybrid system, in effect in Delaware, Florida, Indiana, and Alabama, renders a jury's verdict in the punishment

---

**2.** *Apprendi* involved the application of a "hate crime" statute that enhanced the statutory maximum penalty for a non-death penalty crime while *Walton* involved the application

of a death penalty statute. Indeed, the Court specifically distinguished its holding in *Apprendi* from its holding in *Walton. Apprendi,* 530 U.S. at 496, 120 S.Ct. 2348.

phase of a death penalty case advisory and thus not binding upon the judge who is the ultimate sentencer. Florida and Indiana have already addressed some of the myriad issues raised by the *Ring* decision. *See Bottoson v. Moore*, 2002 WL 31386790, * (Fla.2002) (per curiam); *King v. Moore*, 831 So.2d 143, 2002 WL 31386234, * (Fla. 2002) (per curiam); *Wrinkles v. State*, 776 N.E.2d 905, 2002 WL 31315998, * (Ind. 2002).

*Bottoson* and *King* are both brief per curiam opinions followed by concurring opinions by all of the justices of the Florida Supreme Court. The Florida Supreme Court denied Bottoson and King relief on the grounds that the United States Supreme Court denied the petitioners' writs of certiorari and lifted the stays of execution without mentioning *Ring* in the orders. *Bottoson*, 2002 WL 31386790 at *1, 833 So.2d 693; *King*, 2002 WL 31386234 at *1, 831 So.2d 143.[3] Additionally, the Florida justices noted that the United States Supreme Court has consistently upheld Florida's death penalty statute, and that the Court did not address Florida's statute in *Ring*. Accordingly, the Florida Supreme Court held that *Ring* was inapplicable to the Florida statute. *Bottoson*, 2002 WL 31386790, at *1, 833 So.2d 693; *King*, 2002 WL 31386234, at *1, 831 So.2d 143.[4]

The Indiana Supreme Court addressed the effect of *Ring* on its statute in *Wrinkles v. State*, 776 N.E.2d at 907. In *Wrinkles*, the petitioner sought successive postconviction relief of his conviction and sentence in light of, *inter alia*, the United States Supreme Court's decision in *Ring*. *Id.* at 906. Wrinkles was charged with murdering three people and the jury convicted him of all three murders in the guilt phase of the trial. *Id.* The State sought the death penalty, alleging as the aggravating circumstance that Wrinkles had committed multiple murders. *Id.* The jury unanimously recommended death, and the sentencing judge accepted the jury's recommendation. 776 N.E.2d at 906.

Through his postconviction appeal, Wrinkles argued that *Ring* invalidated Indiana's death penalty scheme.[5] He claimed that his sentence was invalid because there was not a specific jury verdict, beyond a reasonable doubt, that found the existence of an aggravating circumstance, *i.e.*, that Wrinkles had committed multiple murders. *Id.* at 907. The Indiana Supreme Court found no need to decide whether *Ring* applied to Indiana's death penalty scheme because it determined that *Ring* was not implicated in Wrinkles' case. *Id.* More specifically, the court found that

---

**3.** Of course, the United States Supreme Court has cautioned against drawing broad conclusions from a denial of certiorari. *See Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*, 525 U.S. 943, 943, 119 S.Ct. 365, 142 L.Ed.2d 302 (1998) (Mem.) (Stevens, J.) ("[T]he denial of a petition for writ of certiorari is not a ruling on the merits. Sometimes such an order reflects nothing more than a conclusion that a particular case may not constitute an appropriate forum in which to decide a significant issue.") (citation omitted); *see also Lackey v. Texas*, 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (Mem.) (Stevens, J.) ("Often a denial of certiorari on a novel issue will permit the state and federal courts to 'serve as laboratories in

which the issue receives further study before it is addressed by this Court.' ") (quoting *McCray v. New York*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983)).

**4.** It is not necessary here to expound upon the various interpretations of *Ring* by the individual justices of the Florida Supreme Court set forth in the concurring opinions. It is sufficient to note that each justice analyzed many of the intricate issues raised by *Ring* and reached different conclusions as to the future effect of the *Ring* decision.

**5.** As previously noted, Indiana utilizes a hybrid statutory scheme similar to Delaware's.

the jury's verdict that the defendant was guilty of all three murders, "necessarily means that the jury found, beyond a reasonable doubt, that petitioner had committed more than one murder." *Id.* Thus, the court found the aggravating circumstance was established beyond a reasonable doubt by the jury's verdict at the guilt phase. 776 N.E.2d at 908.

### C.

In response to the *Ring* decision, the General Assembly of the State of Delaware amended 11 *Del. C.* § 4209. 73 *Del. Laws* c. 423 (2002), S.B. 449. The 2002 Statute transformed the jury's role, at the so-called narrowing phase, from one that was advisory under the 1991 version of Section 4209 into one that is now determinative as to the existence of any statutory aggravating circumstances. S.B. 449, Synopsis. ("This Act will bar the Court from imposing a death sentence unless a jury (unless waived by the parties) first determines unanimously and beyond a reasonable doubt that at least one statutory aggravating circumstance exists."). The final sentencing decision, however, remains with the judge. *Id.* ("The Court will continue to be responsible for ultimately determining the sentence to be imposed, after weighing all relevant evidence presented in aggravation or mitigation which bears upon the particular circumstances or details of the offenses and the character and propensities of the offender.").

It is against this backdrop that we address the four certified questions.

### II.

As to Certified Question No. 1:

■ Senate Bill 449 provides that "[The 2002 Statute] shall apply to all defendants tried, re-tried, sentenced or re-sentenced after its effective date." S.B. 449, § 6. The Defendants argue that the application of the 2002 Statute to them would violate the *Ex Post Facto* Clause of the United States Constitution. They argue that S.B. 449 represents a substantive change in Section 4209, and is retrospective and disadvantageous to them. Conversely, the State argues that S.B. 449 represents a mere procedural change to Section 4209 and thus cannot violate the *Ex Post Facto* Clause.

■ Article I, Section 10, of the United States Constitution provides that "No State shall . . . pass any . . . ex post facto Law . . . ." U.S. CONST. art. I, § 10. The prohibition against *ex post facto* laws applies only to retroactive penal statutes that disadvantage a defendant. *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).[6] The United States Supreme Court has drawn a distinction between substantive and procedural *ex post facto* laws. *See, e.g., Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). While a substantive change in a penal statute would be *ex post facto,* a procedural change "[e]ven though it may work to the disadvantage of a defendant . . . is not *ex post facto.*" *Id.* at 293, 97 S.Ct. 2290; *see also Hopt v. Utah,* 110 U.S. 574, 590, 4 S.Ct. 202, 28 L.Ed. 262 (1884) (holding that a change is procedural if it does "not increase the punishment nor

---

**6.** Indeed, as Chief Justice Rehnquist noted in *Collins,* " 'ex post facto law' was a term of art with an established meaning at the time of the framing of the Constitution." *Collins,* 497 U.S. at 41, 110 S.Ct. 2715. This meaning included laws that made previously innocent conduct criminal, laws that aggravated an existing criminal offense, laws that inflicted greater punishment for an existing criminal offense, and laws that resulted in evidentiary changes that required less proof in order to convict a defendant. *Id.* at 42, 110 S.Ct. 2715 (quoting *Calder v. Bull,* 3 U.S. [3 Dall.] 386, 390, 1 L.Ed. 648 (1798) (Chase, J.)).

change the ingredients of the offense or the ultimate facts necessary to establish guilt.").

■ The party challenging a law as *ex post facto* bears the burden of demonstrating that the new law represents a substantive change. *California Department of Corrections v. Morales*, 514 U.S. 499, 510 n. 6, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). In order to meet this burden, the challenging party must establish that (1) the new law is retrospective—in other words, it applies to events occurring before its enactment; and (2) that the new law disadvantages the defendant. *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981).

*Dobbert* and *Cohen* are both instructive in determining whether the 2002 Statute is *ex post facto* and thus unconstitutional. In *Dobbert*, the new Florida statute at issue established a bifurcated system in the wake of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and thus "simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." *Dobbert*, 432 U.S. at 293–94, 97 S.Ct. 2290. Moreover, the United States Supreme Court noted that in addition to being procedural, the change in the statute actually benefited defendants, and thus was not *ex post facto* because it was not "more onerous than the prior law." *Id.* at 294, 97 S.Ct. 2290. Likewise, in *Cohen* we accepted the teachings of *Dobbert* and rejected the defendants' *ex post facto* argument holding that "the new law...merely alter[s] the method of determining the imposition of the death penalty." *Cohen*, 604 A.2d at 853. Moreover, because we determined that the revisions to Section 4209 were merely procedural, we did not address the defendants'

claims that the new law was retrospective and disadvantageous. *Id.* at 854.

We reach the same conclusion here. The 2002 Statute is not *ex post facto* because the changes delineated in S.B. 449 are procedural in nature. The 2002 Statute simply requires that a jury find the existence of at least one aggravating factor beyond a reasonable doubt, and that its finding is then binding upon the judge. In other words, rather than requiring an advisory verdict followed by a separate finding by the judge, the 2002 Statute alters the procedure of Section 4209 and makes a jury's determination as to the existence or absence of aggravating factors binding upon the trial judge. Moreover, to the extent that the jury's role at the narrowing phase has become one of a mandatory finding of an aggravating factor to permit the weighing process to occur, it seems the 2002 Statute actually benefits defendants by requiring a binding and unanimous verdict as to the existence of an aggravating factor. As in *Cohen*, because we have determined that the changes in the 2002 Statute are procedural, we need not decide whether the changes are ameliorative. We answer the First Certified Question in the affirmative.

### III.

As to Certified Question 2:

■ The Defendants contend that *Ring* requires a jury finding, in the first instance, of any non-statutory aggravating factors later considered by the sentencing judge. The State argues that *Ring* does not extend beyond the narrowing phase, but rather merely requires the jury to find the existence of one statutory aggravating factor before the judge may consider all aggravating and mitigating factors during the weighing phase.

■ *Ring* instructs that "[c]apital defendants, no less than non-capital defendants...are entitled to a jury finding of any fact on which the legislature conditions *an increase* in their maximum punishment." *Ring*, 536 U.S. at ——, 122 S.Ct. at 2432 (emphasis supplied). As previously noted, *Ring* overruled *Walton* "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance *necessary* for the imposition of the death penalty." *Id.* (emphasis supplied). *Ring* does not, however, require that the jury find every fact relied upon by the sentencing judge in the imposition of the sentence.

■ The narrowing phase under the 2002 Statute simply requires a jury to find, unanimously and beyond a reasonable doubt, the existence of at least one statutory aggravating circumstance before the sentencing judge may consider imposing the death sentence. Non-statutory aggravators, if considered at all, do not enter the mix until after the jury performs its essential function during the narrowing phase. Accordingly, a finding of non-statutory factors does not "increase" the maximum penalty that a defendant can receive. Rather, non-statutory aggravators are part of the total mix, including mitigating factors, when the sentencing judge performs his function during the weighing phase. Therefore, we answer the Second Certified Question in the negative.

### IV.

As to Certified Question 3:

■ Under the 2002 Statute, the sentencing judge retains exclusive responsibility for weighing the aggravating and mitigating factors, and for the ultimate sentencing decision. Once the jury determines that a statutory aggravating factor exists, the defendant becomes death eligible. 73 *Del. Laws* c. 423 (2002), S.B. 449, § 3. Although a judge cannot sentence a defendant to death without finding that the aggravating factors outweigh the mitigating factors,[7] it is not that determination that increases the maximum punishment. Rather, the maximum punishment is increased by the finding of the statutory aggravator. At that point a judge can sentence a defendant to death, but only if the judge finds that the aggravating factors outweigh the mitigating factors. Therefore, the weighing of aggravating circumstances against mitigating circumstances does not increase the punishment. Rather, it ensures that the punishment imposed is appropriate and proportional. Because we find that *Ring* does not extend to the weighing phase, we answer the Third Certified Question in the negative.

### V.

As to Certified Question 4:

Title 11, Section 4209(e)(2) of the Delaware Code states, "In any case where the defendant has been convicted of murder in the first degree in violation of any provision of § 636(a)(2)-(7) of this title, that conviction shall establish the existence of a statutory aggravating circumstance and the jury, or judge where appropriate, shall be so instructed." 11 *Del. C.* § 4209(e)(2). In *Bailey v. State* we held that an instruc-

7. S.B. 449, § 3 ("...the Court, after considering the findings and recommendation of the jury and without hearing or reviewing any additional evidence, shall impose a sentence of death if the Court finds by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist.").

tion given by a sentencing judge pursuant to 11 *Del. C.* § 4209(e)(2) did not unconstitutionally establish a conclusive presumption or obviate the requirement that the State prove the aggravators beyond a reasonable doubt. 490 A.2d 158, 173 (Del. 1984). Our reasoning in *Bailey* is unchanged by the holding in *Ring*.

■ The sentencing judge, by directing a verdict under 11 *Del. C.* § 4209(e)(2), does not circumvent the holding of *Ring* requiring the jury to find the existence of any fact that increases the maximum penalty to which a defendant may be sentenced. Only those facts that are established by the jury's guilty verdict are subject to a "directed verdict" as to the existence of aggravating factors during the penalty phase. Section 4209(e)(2) complies with *Ring* because the jury's verdict of guilt establishes the existence of the fact which increases the punishment and such finding, necessarily, was made unanimously and beyond a reasonable doubt. In other words, a guilty verdict under § 636(a)(2)–(7) authorizes a maximum punishment of death. The fact that this finding is ceremonially rendered a second time during the penalty phase does not alter the analysis. Confusion would undoubtedly result if a sentencing judge were not permitted to instruct a jury that it is required to find the existence of facts it has already found *by its verdict at the guilt phase.* A jury not so instructed could, through inadvertence or ignorance, render a finding in the narrowing phase that rejects the statutory aggravator found in the guilt phase. Such a result would call into question the guilty verdict already rendered. For these rea-

sons, we answer the Fourth Certified Question in the affirmative.

## VI.

■ In addition to answering the four Certified Questions, we think it is important to address the issue of structural error, as it relates to both the 1991 version of Section 4209 and the 2002 Statute to the extent the argument has been made that both statutes suffer from that constitutional defect. In essence it is argued that viewed from *Ring's* perspective, structural error existed in the 1991 statute and the 2002 amendment did not correct it.

In Delaware, a person convicted of first-degree murder is sentenced to either life imprisonment or death. 11 *Del. C.* § 4209(a). Pursuant to the 1991 version of Section 4209 (the "1991 Statute"), when a defendant was convicted of first-degree murder, a separate hearing was held to determine the appropriate penalty. *Id.* at § 4209(b)(1)–(2). In most cases, this hearing was conducted by the trial judge before the jury that convicted the particular defendant. *Id.*[8]

The sole determination at the hearing was the penalty to be imposed, and thus some of the evidentiary barriers present during the guilt phase were removed. *Id.* at § 4209(c)(1). At the conclusion of the hearing the jury provided recommendations whether: (1) the evidence proved beyond a reasonable doubt the existence of at least one statutory aggravating circumstance;[9] and (2) by a preponderance of the evidence, the aggravating circumstances found to exist outweighed the mitigating circumstances found to exist. 11 *Del. C.* § 4209(c)(3)a.1–2. Although the

---

8. Of course, this hearing could be conducted by a trial judge alone if the jury was waived by the defendant and the State. 11 *Del. C.* § 4209(b)(1)–(2).

9. The statutory aggravating circumstances are provided in section 4209(e) of title 11 of the Delaware Code.

jury merely made a recommendation on these issues, it nevertheless reported a particular numerical vote to the trial court. *Id.* at § 4209(c)(3)b. While the court considered this recommendation, only the judge could impose the death sentence. *Id.* at § 4209(d).

The United States Supreme Court has taken a categorical approach to structural errors. *Neder v. United States,* 527 U.S. 1, 14, 119 S.Ct. 1827, 1836, 144 L.Ed.2d 35 (1999). In other words, "a constitutional error is either structural or it is not." *Id.* In order to make this determination, a reviewing court must "distinguish[ ] between...'structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards'...and...trial errors which occur 'during the presentation of the case to the jury and which may therefore be quantitatively assessed in the context of other evidence presented.'" *Sullivan v. Louisiana,* 508 U.S. 275, 281, 113 S.Ct. 2078, 2082–2083, 124 L.Ed.2d 182 (1993) (quoting *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). The presence of a structural defect invalidates the proceeding and requires reversal. *See, e.g., Sullivan,* 508 U.S. at 282, 113 S.Ct. at 2081, 2083. This is so because structural errors are not subject to a harmless error analysis.[10]

Under the 1991 Statute, Delaware juries had an advisory role in the penalty phase and merely made recommendations to the judge regarding (1) the existence of aggravating circumstances, and (2) whether the aggravating circumstances found to exist outweighed the mitigating circumstances, if any, found to exist. While the judge would expressly inform the jury that its recommendations would be accorded "great weight," their role was nevertheless advisory. Prior to *Ring* this process undoubtedly comported with the United States Constitution and the Delaware Constitution of 1897.[11] *Capano v. State,* 781 A.2d 556, 669–673 (Del.2001). In light of *Ring,* however, it is necessary to address the issue of potential structural defect in the 1991 Statute.

The United States Supreme Court has identified only six instances where structural error exists. *See Lucero v. The State of Texas,* 2002 Tex.App. Lexis 7452, at *6 (October 16, 2002) (citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)) (total deprivation of the right to counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (an impartial judge); *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (unlawful exclusion of the defendant's race from a grand jury); *McKaskle v. Wiggins,* 465 U.S. 168, 177–78, n. 8, 104

10.  Before an error is deemed harmless, however, the State must demonstrate "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

11.  Despite the General Assembly's response to *Ring,* it could be argued that the constitutionality of the 1991 Statute was unchanged by Ring. *Ring,* 536 U.S. at —— n. 6, 122 S.Ct. at 2442 n. 6 (distinguishing the statutes of Delaware, Alabama, Florida, and Indiana from the process utilized in Arizona, and at issue in *Ring*), and 2450 (O'Connor, dissenting) (noting that death row inmates may im-

properly seize on the Court's decision in *Ring* and attempt to extend the reasoning to the "hybrid sentencing schemes" of Delaware, Alabama, Indiana and Florida); *Cf. Bottoson v. Moore,* 833 So.2d 693, 2002 Fla. Lexis 2200, * (Fla. October 24, 2002) (upholding death sentence imposed under Florida's pre-*Ring* statute); *King v. Moore,* 831 So.2d 143, 2002 Fla. Lexis 2199, * (Fla. October 24, 2002) (same); *Wrinkles v. State of Indiana,* 776 N.E.2d 905, 2002 Ind. Lexis 802, * (Ind. October 15, 2002) (holding that "*Ring* is not implicated in petitioner's case under any view that the Court might find plausible.").

S.Ct. 944, 950–51, n. 8, 79 L.Ed.2d 122 (1984) (the right to self-representation); *Waller v. Georgia,* 467 U.S. 39, 49, n. 9, 104 S.Ct. 2210, 2217, n. 9, 81 L.Ed.2d 31 (1984) (the right to public trial); and *Sullivan v. Louisiana* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable doubt instruction). Indeed, it appears that the United States Supreme Court employs structural error analysis only when reviewing constitutional errors that occurred during the guilt/innocence phase of the trial. *See Arizona v. Fulminante,* 499 U.S. 279, 306–307, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302 (listing cases where harmless error analysis was appropriate despite the existence of constitutional errors); *see also, Neder,* 119 S.Ct. at 1836–37 (holding that failure to instruct on an element of the offense is not structural error); *but see Satterwhite v. Texas,* 486 U.S. 249, 256–258, 108 S.Ct. 1792, 1797–1798, 100 L.Ed.2d 284 (1988) (discussing structural error analysis in the course of reviewing a constitutional error that occurred during capital sentencing phase, but ultimately determining that harmless error analysis was appropriate). In other words, there is a difference between the guilt/innocence phase and the sentencing phase in a structural error analysis. *Lockhart v. McCree* 476 U.S. 162, 183, n. 18, 106 S.Ct. 1758, 1770, n. 18, 90 L.Ed.2d 137 (1986) ("The majority in *Adams* rejected the dissent's claim that there was 'no plausible distinction between the role of the jury in the guilt/innocence phase of the trial and its role [...] in the sentencing phase.'") (quoting *Adams v. Texas,* 448 U.S. 38, 54, 100 S.Ct. 2521, 2531, 65 L.Ed.2d 581 (1980)). This Court has also recognized such a distinction. *See Capano,* 781 A.2d at 669 (citing *State v. Cohen,* 604 A.2d 846, 851–52 (Del.1992)).

The argument that there was a structural defect in Delaware's capital sentencing scheme under the 1991 Statute is not sup-ported by *Ring.* Indeed, implicit in *Ring* is the finding that the constitutional defect in Arizona's capital sentencing scheme did not amount to structural error. The United States Supreme Court declined to address Arizona's harmless error argument, but in doing so it implicitly suggested that harmless error analysis would be an appropriate inquiry for the Arizona Supreme Court. *Ring,* 536 U.S. at —— n. 7, 122 S.Ct. at 2443 n. 7. Moreover, the United States Supreme Court designated Delaware's capital sentencing scheme as a "hybrid system," *Ring,* 536 U.S. at —— n. 6, 122 S.Ct. at 2442 n. 6, and thus distinguished our system from Arizona's. The holding of *Ring* is quite simple: *Walton* is overruled "to the extent it allows a sentencing judge, *sitting without a jury,* to find an aggravating circumstance necessary for imposition of the death penalty." *Ring,* 536 U.S. at ——, 122 S.Ct. at 2443 (citation omitted) (emphasis supplied). Under the 1991 Statute, the jury was involved in the narrowing phase, albeit in an advisory capacity. Therefore, to find structural defect in the 1991 Statute would arguably extend the holding in *Ring* well beyond its intended scope.

If *Ring* does not provide the basis for a finding of structural defect, then we must look to the precedent in this area to resolve the issue. As noted above, there are six sets of constitutional errors that amount to structural error, and thus are not susceptible of a harmless error analysis. Therefore, in order to demonstrate that there was a structural defect in Delaware's capital sentencing scheme under the 1991 Statute, one must fit the purported defect into one of the six categories. For purposes of analogy, the closest analytical category is the defective reasonable doubt instruction at issue in *Sullivan v. Louisiana.*

In *Sullivan*, the defendant was charged with first-degree murder in the course of committing a robbery. 113 S.Ct. at 2080. Although there was circumstantial evidence connecting the defendant to the murder, defense counsel argued in closing that reasonable doubt existed as to identity and intent. *Id.* While instructing the jury, the trial judge gave what the State of Louisiana later conceded was an unconstitutional definition of reasonable doubt. *Id.* The defendant was subsequently convicted and sentenced to death. *Id.*

The United State Supreme Court began its analysis by noting that "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Sullivan*, 113 S.Ct. at 2081 ("It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated."). Accordingly, the defective reasonable doubt instruction had the effect of denying the defendant his constitutional right to a jury determination of guilty beyond a reasonable doubt. *Id.* at 2081–2082 ("[T]o hypothesize a guilty verdict *that was never in fact rendered*—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.") (emphasis supplied). Because "there [was] no jury verdict within the meaning of the Sixth Amendment...[t]here [was] no *object* ...upon which harmless-error scrutiny [could] operate." *Id.* at 2082 (emphasis original). This amounted to structural error because it was impossible to quantify the effect of the constitutional error. *Id.* at 2083.

Sentences rendered under the 1991 Statute do not suffer from the same constitutional defect. First, defendants sentenced under Delaware's 1991 scheme were not denied a jury verdict of guilty beyond a reasonable doubt. Second, the advisory jury made specific numerical findings as to the existence of statutory aggravating circumstances. We need not hypothesize findings of aggravating factors that were never rendered; rather, the jury's numerical finding is the "object" upon which we may cast the lens of harmless error review. Because any error under the 1991 Statute does not fit into any of the structural error categories delineated by the United States Supreme Court,[12] harmless error analysis is appropriate.[13]

■ Even if there were a structural defect in the capital sentencing scheme

12. The other categories are similarly unavailing and do not lend themselves to meaningful analysis here: total deprivation of the right to counsel at trial, the unlawful exclusion of members of the defendant's race from a grand jury, improper interference with the right to self-representation at trial, and unlawful infringement upon the right to a public trial.

13. It has been argued that a potential *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), problem exists in that juries under the 1991 Statute were improperly misled into believing that the ultimate decision on the existence of statutory aggravating circumstances rested with the court. If this argument were accepted, the "object" upon which harmless error analysis

would operate—the numerical vote representing a finding of statutory aggravators—would arguably be tainted because the jury may have been misled into believing that its finding on the issue was ultimately meaningless. The holding in *Caldwell*, however, rested on Eighth Amendment grounds, 105 S.Ct. at 2639, and not upon a finding of structural error. Further, it could be argued that where the jury is instructed that it found a statutory aggravator by its verdict at the guilt stage, such a "finding" during the narrowing phase is meaningless and thus not a proper "object" upon which to apply harmless error scrutiny. This "what if" scenario premised upon *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) is too speculative to require comment.

under the 1991 Statute, the General Assembly's 2002 amendment of Section 4209 cured that defect. If *Ring* applies to Delaware at all, it only reaches the "narrowing phase" of the sentencing process in as much as it requires: (1) the jury to find the existence of any statutory aggravating circumstances; (2) that the finding be beyond a reasonable doubt; and (3) that the jury's finding on the issue be binding upon the judge. Accordingly, the 2002 Statute eliminates any arguable defect in the 1991 Statute. 73 *Del. Laws* c. 423 (2002), S.B. 449 ("This Act will bar the Court from imposing a death sentence unless a jury (unless waived by the parties) first determines unanimously and beyond a reasonable doubt that at least one statutory aggravating circumstance exists.").

The fact that the trial judge remains responsible for the ultimate sentencing decision under the 2002 Statute does not change the analysis. Even though *Ring* may be read to extend the jury's role to the finding of aggravating circumstances during the sentencing phase, a function made explicit and necessary under the 2002 Statute, nothing in *Ring* suggests that the trial judge may not retain the responsibility of making the ultimate sentencing decision, subject to affording the jury its acknowledged role in the sentencing process.

Questions Answered.