Darrel PAGE, Defendant
Below–Appellant

v.

STATE of Delaware, Plaintiff
Below–Appellee.

No. 152, 2006.

Supreme Court of Delaware.

Submitted: July 11, 2007.
Decided: Oct. 10, 2007.

Gregory A, Morris of Liguori, Morris & Yiengst, Dover, DE and Joseph F. Lawless (argued) of Newtown Square, PA, for Appellant.

Kevin J. Carroll, Department of Justice, Wilmington, DE, for Appellee.

Before STEELE, Chief Justice, HOLLAND, and RIDGELY, Justices.

RIDGELY, Justice:

Defendant–Appellant Darrel Page appeals his Superior Court convictions of three counts of Murder First Degree, one count of Attempted Murder First Degree, five counts of Possession of a Firearm During the Commission of a Felony, one count of Robbery Second Degree, one count of Conspiracy First Degree, and one count of Endangering the Welfare of a

Child. Page was sentenced to three life sentences without the possibility of probation or parole on the murder convictions. In this appeal, Page contends that the State infringed upon his Sixth Amendment rights to a speedy trial and the effective assistance of counsel. He also asserts that the trial judge erred by admitting into evidence certain photographs, portions of a video of the crime scene, and evidence of an out-of-court statement of a witness pursuant to 11 *Del. C.* § 3507. We find no merit to his arguments and affirm.

## I. Background

Page, a/k/a Quazzi, and Michael Jones, a/k/a Gotti, were members of a large drug ring that sold crack cocaine and marijuana in Wilmington, Delaware. Cedric Reinford, a/k/a Dreds, was the leader of the operation and would arrange large shipments of narcotics from New York City to be divided for retail sale among several dealers, including Page and Jones. The headquarters of Page's and Jones's part of Reinford's operation was the home of Page's girlfriend, Kim Still.

In early 1999, Page was arrested for trafficking in cocaine. In exchange for Reinford providing Page money to pay for bail and counsel, Page agreed to sell drugs for Reinford without taking any share of the profits. After nine months of this arrangement, Page formulated a plan to end it by killing Reinford. He enlisted Jones to help him carry out his plan.

On November 20, 1999, Jones, Page and Reinford were together in Reinford's car in Wilmington. Jones killed Reinford by shooting him three times in the back of the head. Page and Jones doused Reinford's car with gasoline and set it on fire with Reinford's body inside it. They next proceeded to Reinford's house to take Reinford's drug money from a safe. At the house, Jones shot and killed Reinford's fiancé, Maneeka Plant. He also shot Reinford's brother, Muhammad, between the eyes and left him for dead. Page and Jones fled to Philadelphia. Muhammad miraculously survived the shooting and called 911. He identified Page and Jones to the police. The police investigation led to the questioning of Still who explained Page's plan to kill Reinford. After a ten-month manhunt that included an "America's Most Wanted" episode, Page was tracked down in Atlanta, Georgia and arrested on November 3, 2000.[1] On January 29, 2001, Page was indicted by the Grand Jury.

Counsel was appointed to represent Page on April 4, 2001. Page's attorneys advised the Superior Court that their commitments on other court-appointed homicide cases precluded a trial within one year. Administrative Directive No. 88 addresses the scheduling of capital cases in Delaware. It provides that:

> All [capital] cases must be tried and/or otherwise adjudicated within one year from the date of the arrest. . . . Because of their complexity, capital cases occasionally may present unique problems that preclude a trial or other disposition within the one-year period. A judge therefore may depart from those guidelines when the interests of justice require.[2]

After hearing from counsel, the Superior Court scheduled Page's trial for February

---

1. A year later, on September 11, 2001, the police captured Jones in North Carolina.

2. Administrative Directive 88 was superseded and repealed by Administrative Directive 131 on July 1, 2001. The only modification to the above quoted section was to change the one-year period to start from the date of indictment rather than the date of arrest. *See* Del. Supr. Admin. Dir. 131.

21, 2002, approximately 16 months after his arrest and 13 months after his indictment. Seven days before the trial, Page's counsel informed the trial judge that one of his experts and one of his investigators were unwilling to perform further services absent an advanced retainer fee. The trial judge informed counsel that the requested funds would not be available for the balance of the fiscal year which ended June 30. Page's counsel then moved for a continuance on the grounds that there were insufficient funds to pay for the needed experts.[3] The trial judge continued Page's trial "until such time as defense experts and investigators can be paid." Page's trial was then set for September 10, 2002 with jury selection to commence on September 4.

Meanwhile, the United States Supreme Court decided *Ring v. Arizona*[4] on June 24, 2002. The Delaware General Assembly promptly amended the law defining the procedure in capital cases in response to *Ring*, and the Governor signed this legislation on July 22, 2002.[5] Because of the legal issues raised by these developments, the Superior Court certified 16 questions

in two capital cases that were pending trials.[6] Four days later, the President Judge of the Superior Court directed, with the concurrence of the Judges of the Superior Court, that all pending trials and penalty hearings in capital first-degree murder cases would be temporarily stayed pending the determination by this Court of the certified questions.[7] This Court accepted four of the certified questions and answered them in an opinion issued on January 16, 2003.[8] The temporary stay was lifted by the President Judge on January 27, 2003. Page then proceeded to trial on May 20, 2003.[9]

■ A Superior Court jury convicted Page of three counts of Murder First Degree, one count of Attempted Murder First Degree and related weapons and conspiracy charges.[10] Following a penalty hearing, the jury recommended, by a vote of eight to four on each of the three Murder First Degree counts, that Page be sentenced to death. The trial judge ultimately sentenced Page to life imprisonment for each of the murder convictions.[11] This appeal followed.

3. In his motion, Page's counsel cited that the continuance was needed because of his belief that the experts were necessary to assist the defense's investigation "into factual circumstances as well as potential penalty hearing issues," and the expert and investigator would help the defense develop and prepare its case fully.

4. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

5. 73 Del. Laws c. 423 (2002).

6. *See Brice v. State,* 815 A.2d 314 (Del.2003).

7. 815 A.2d 314 (Del.2003). In *Brice,* this Court considered the constitutionality of amendments to Delaware's death penalty statute in light of *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

8. *Brice v. State, supra.*

9. By this point, Jones had been arrested and charged. Because Page's defense was that Jones forced him at gunpoint to commit the murders, the trial judge granted a motion to sever his case from Jones's.

10. Of the 16 charges, Page was acquitted of Arson Second Degree, one count of Possession of a Deadly Weapon During the Commission of a Felony, and one count of Conspiracy Second Degree.

11. The court delayed Page's sentencing until Jones was tried so that it would have the full-range of information necessary to ensure that the sentences were proportionate. On January 27, 2005, a Superior Court jury unanimously convicted Jones of three counts of Murder First Degree and several related weapons and conspiracy charges. Because Jones was 17 at the time of the killings, however, and in light of the U.S. Supreme Court's

## II.　The Denial of Speedy Trial Claim

▮▮▮ Page first contends that the State infringed upon his Sixth Amendment right to a speedy trial. He rests his argument on the trial judge's failure to appoint substitute counsel *sua sponte* after being informed of his court-appointed attorneys' scheduling conflicts. He also argues that the State's budgetary limitations led to another six month delay of his trial. Page claims that these are "structural errors" that warrant a reversal of his Superior Court convictions. This Court reviews claims alleging an infringement of a constitutionally protected right *de novo*.[12] However, if a defendant fails to object at trial to an alleged constitutional infringement, we review for plain error.[13]

▮▮▮ As the United States Supreme Court observed in *Barker v. Wingo*, "[t]he right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused."[14] Consequently, the determination of the precise moment when the right has been denied is impossible to determine.[15] Because the right is necessarily relative, federal and Delaware courts apply a four-part test to determine whether a defendant's right to a speedy trial has been violated.[16] Under this test, courts are to evaluate the following factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) prejudice to the defendant.[17] These factors are related and "must be considered together with such other circumstances as may be relevant."[18] The threshold consideration, however, is the length of the delay.[19] Unless it is presumptively prejudicial, the court will not examine the remaining three factors.[20] In this case, our review is for plain error because Page did not object or otherwise preserve his speedy trial argument before the Superior Court.[21]

▮▮▮ The first factor, the length of delay, weighs in Page's favor because the right to a speedy trial attached when he was arrested on November 3, 2000.[22] Although the reasons for the delay offered by the State on this factor are appropriately considered next, the lapse of two years, six

decision in *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), abolishing the juvenile death penalty in the United States, the trial judge sentenced Jones to three terms of life imprisonment. Because "it would be inequitable and unjust to impose the death penalty upon Page, when it is constitutionally prohibited from imposing the same sentence upon the co-defendant," the court imposed on Page three life sentences without the benefit of probation, parole or any other reduction.

12. *Keyser v. State*, 893 A.2d 956, 961 (Del. 2006).

13. *Id.*

14. *Barker v. Wingo*, 407 U.S. 514, 519, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

15. *Id.* at 521, 92 S.Ct. 2182.

16. *Id.* at 530, 92 S.Ct. 2182; *Middlebrook v. State*, 802 A.2d 268, 273 (Del.2002).

17. *Middlebrook*, 802 A.2d at 273; *Mills v. State*, 900 A.2d 101, 2006 WL 1027202, at *2 (Del.Supr.).

18. *Middlebrook*, 802 A.2d at 273 (citing *Barker*, 407 U.S. at 533, 92 S.Ct. 2182).

19. *Skinner v. State*, 575 A.2d 1108, 1115 (Del. 1990).

20. *Id.*; *Middlebrook*, 802 A.2d at 274; *Mills*, 2006 WL 1027202, at *2.

21. *See Keyser v. State*, 893 A.2d 956, 961 (Del.2006).

22. *See Middlebrook*, 802 A.2d at 273 ("The right to a speedy trial attaches as soon as the defendant is accused of a crime through arrest or indictment, whichever occurs first.").

months, and seventeen days from Page's arrest to the start of his trial raises a presumption of prejudice.[23] Accordingly, the first factor weighs in favor of Page.

■ The second factor, the reason for the delay, also weighs in Page's favor, but only slightly. In discussing this factor, the Supreme Court in *Barker* recognized that "[t]he inability of courts to provide a prompt trial has contributed to a large backlog of cases in urban courts which, among other things, enables defendants to negotiate more effectively for pleas of guilty to lesser offenses and otherwise manipulate the system."[24] At the same time, delay may work toward a defendant's advantage because "[a]s the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade."[25] Thus, "[d]ifferent weights are assigned to different potential reasons for the delay."[26] For example, a "deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the State, while a more neutral reason such as negligence or overcrowded courts should be weighted less heavily against the State."[27] In other words, benign reasons for trial delays weigh less heavily against the State.[28]

The record shows that none of the reasons for delay were deliberate attempts by the State to delay Page's trial. Almost a year and a half of the delay was due to a stay of all capital cases pending the outcome of a decision on certified questions to this Court. Although Page's counsel specifically requested the remainder of the delay, further analysis is necessary under the circumstances of this case.

The initial delay was requested by Page's counsel due to scheduling conflicts with other court-appointed homicide cases. Although Administrative Directive 88 required capital cases to be tried or disposed of within one year, the directive also provided flexibility and allowed departure from the guideline, "when the interests of justice require." More importantly, our analysis is under the Sixth Amendment and the factors identified in *Barker v. Wingo.* There is no evidence in the record that the assignment of defense counsel and the trial scheduling was intended to hamper Page's defense. On balance this factor weighs only slightly in Page's favor, and less than it would had State's actions been deliberate.[29]

■ The third factor is the defendant's assertion of a speedy trial. This

---

23. *Cf., e.g., id.* at 274 (finding a delay of almost four years "a cause for considerable concern"); *Mills,* 2006 WL 1027202, at *2 (accepting the State's concession that a delay of 15 months from arrest to trial in an "uncomplicated case" raised a presumption of prejudice).

24. *Barker,* 407 U.S. at 519, 92 S.Ct. 2182.

25. *Id.* at 521, 92 S.Ct. 2182. Likewise, if "the witnesses support the prosecution, its case will be weakened, sometimes seriously so, [considering] it is the prosecution which carries the burden of proof." *Id.* "Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not per se

prejudice the accused's ability to defend himself." *Id.*

26. *Middlebrook,* 802 A.2d at 274.

27. *Id.* (internal quotation marks and citation omitted).

28. *Mills,* 2006 WL 1027202, at *2.

29. *See Key v. State,* 463 A.2d 633, 637 (Del. 1983) ("Judicial tolerance is often appropriate if a delay is caused by occasional inadvertence or excessive demands placed on a part of the criminal justice system, but in any given case the delay or the reason behind it may be intolerable and thus unjustified").

factor clearly weighs against Page. This factor is "of considerable significance in determining whether there has been a speedy trial violation."[30] Likewise, the lack of protest or the "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."[31] This factor also implicitly puts on the defendant "some responsibility to call attention to what he views as an unfair postponement."[32] The record shows that at no point prior to this appeal did Page or his counsel assert his Sixth Amendment rights to a speedy trial. While the failure to demand a speedy trial does not bar a defendant from raising the issue,[33] Page's apparent acquiescence to the delays and his silence until this appeal are significant.

The fourth factor, prejudice to the defendant from the delay, also weighs against Page. We analyze this prong with consideration of the interests of a defendant "that the speedy trial right was designed to protect: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired."[34] Page was incarcerated before trial for slightly more than two and half years. Over half of this time can be attributed to a stay of all capital cases. Page's counsel was also counsel for Miles Brice in the certified questions appeal that addressed issues common to all capital cases, including Page's. Page's own silence suggests that he did not suffer oppressive pretrial incarceration or any undue anxiety related to the delay.[35] The answers to the certified questions applied to all capital defendants awaiting trial. The practical effect of the temporary stay was that Page and all capital defendants were included in a class with common questions of law to be decided through the certified questions in *Brice*. Additionally, the record shows that Page's defense was not impaired. Given the totality of the circumstances, we find no plain error and no denial of Page's right to a speedy trial.

## III. The Ineffective Assistance of Counsel Claims

■ Page also raises two claims of ineffective assistance of counsel, the first of which he weaves into his denial of a speedy trial argument. Page argues that his court-appointed attorney's scheduling conflict forced him to choose between his right to a speedy trial or his right to effective assistance of counsel. We have already concluded that Page was not denied his right to a speedy trial. The question of whether or not his trial counsel was ineffective in any way has not yet been considered by the Superior Court. Accordingly,

**30.** *Middlebrook,* 802 A.2d at 275 (quoting *Bailey v. State,* 521 A.2d 1069, 1082 (Del.1987)).

**31.** *Id.* (quoting *Barker,* 407 U.S. at 532, 92 S.Ct. 2182); *Key,* 463 A.2d at 637.

**32.** *Middlebrook,* 802 A.2d at 276; *Key,* 463 A.2d at 637. *See Barker,* 407 U.S. at 528, 92 S.Ct. 2182.

**33.** *Barker,* 407 U.S. at 528, 92 S.Ct. 2182; *Key,* 463 A.2d at 637.

**34.** *Middlebrook,* 802 A.2d at 276. The U.S. Supreme Court has held that the length of time between arrest and trial may create a rebuttable presumption of prejudice for this factor. *Doggett v. U.S.,* 505 U.S. 647, 658, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) (finding an eight and half year delay to create a presumption of prejudice). Similarly, this Court has found a four year delay to be presumptively prejudicial. *See Middlebrook,* 802 A.2d at 277.

**35.** *Cf. Doggett,* 505 U.S. at 658, 112 S.Ct. 2686 ("[W]hen the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief.") (internal citations omitted).

we will not address his claims of ineffective assistance of counsel in this direct appeal.[36]

## IV. The Admissibility of Evidence Claims

■ Page's final three arguments relate to the admissibility of evidence. We review the trial judge's evidentiary rulings for an abuse of discretion.[37] When a defendant fails to make a timely objection to the evidence, however, we review only for plain error.[38]

### A. The Arson Scene Photographs

■ First, Page argues that the trial judge erred by admitting photographs depicting the remains of Reinford's car and charred body. Specifically, Page argues that, in light of the autopsy photographs which already showed Reinford's body, the photographs of the burnt car were cumulative and unduly prejudicial. The trial judge disagreed, ruling that the photos were admissible because they would aid the jury in understanding the State arson investigator's testimony with respect to the origin of the fire.

■ "Trial judges have very broad discretion in admitting photographic evidence of victims' injuries."[39] Because Page's indictment included one count of second degree arson, the State had the burden to prove that charge beyond a reasonable doubt. It was not an abuse of discretion for the trial judge to conclude in this case that the photographs of Reinford's car and

body had probative value which was not substantially outweighed by the danger of unfair prejudice. Further, the jury acquitted Page of this charge, rendering this claim of error moot.[40]

### B. The Murder Scene Video

[22] Page also argues that the Superior Court erred by admitting a video of the crime scene that included images of Maneeka Plant's body. Page objected to portions that contained "close-ups" of her body and the surrounding blood on the grounds that its only purpose was to inflame the jury. The trial judge concluded that the probative value of the video outweighed any danger of prejudice because the video would aid in understanding Muhammad Reinford's testimony and help show that the killing was intentional because of the positions of the victim and condition of the house.

Page argues that the State could have accomplished each of its above stated goals by means of photographs or a diagram or that a more technologically appropriate way of editing the video could have been done "in [this] era of computer graphics and digital photography." In response to a similar argument in *Casalvera v. State*,[41] this Court noted that a "prosecutor is not required to minimize [the brutality of a criminal act] by selecting the least dramatic means of presenting his evidence."[42] This Court has further explained:

36. *Duross v. State*, 494 A.2d 1265, 1267 (Del. 1985); *Wright v. State*, 513 A.2d 1310, 1315 (Del.1986).

37. *Smith v. State*, 913 A.2d 1197, 1228 (Del. 2006).

38. *Wainwright v. State*, 504 A.2d 1096, 1100 (Del.1986).

39. *Ortiz v. State*, 869 A.2d 285, 294 (Del. 2005).

40. *See Stevens v. State*, 610 A.2d 727, 1992 WL 151317, at *1 (Del.Supr.); *Perry v. State*, 575 A.2d 1154 (Del.1990).

41. 410 A.2d 1369 (Del.1980).

42. *Id.* at 1373; *Keperling v. State*, 699 A.2d 317, 319 (Del.1997).

[T]he fact that a photograph of the victim may be gruesome or unpleasant does not render it inadmissible. The trial judge must determine if the probative and material evidentiary value of the photograph, with regard to establishing an element or elements of the alleged offense, is substantially outweighed by potentially unfair prejudice to the defendant.[43]

The mere fact that the video may have contained some gruesome or unpleasant scenes does not render it *per se* inadmissible. We find no abuse of discretion by the trial judge in admitting this evidence.

## V. Admissibility of the Out-of-court Statement

■ Page next contends that the trial judge erroneously admitted Kim Still's out-of-court statement because it was involuntarily given and unnecessarily cumulative. The trial judge conducted a *Getz*[44] analysis and determined that the evidence was admissible to show Page's motive, intent, preparation, plan and knowledge in Reinford's murder. Concerning the admissibility of the statement, the trial judge allowed for *voir dire* of Still and reviewed the video itself. Still testified that her statement was voluntary. After viewing the video and hearing the testimony, the trial judge stated:

I think if you look at the cold antiseptic record, you may get a different feeling, but when you review the tape-recording and how she was treated by the police officers during the course of the interview, I cannot conclude that she was in any way coerced.

She certainly was urged to come clean, to tell them more than she was initially willing to reveal. They used police tactics to try and get her to do that, but not in my opinion tactics that overbore her willingness to testify truthfully or her voluntariness.

And I think under the circumstances, in light of the totality of the circumstances, particularly in view of the tape, as I reviewed it, I think the statement can come in, and that it is voluntary.

■ "Determining whether a statement was voluntarily given requires a careful evaluation of all the circumstances of the interrogation."[45] After considering the video and Still's testimony, the trial judge determined that Still's statement was given voluntarily.[46] Still's motives for speaking with the police were clearly in issue and her out-of-court statement was relevant to that issue and her credibility. We find no plain error and no abuse of discretion by the trial judge in admitting this evidence pursuant to 11 *Del. C.* § 3507.[47]

43. *Keperling,* 699 A.2d at 319.

44. *Getz v. State,* 538 A.2d 726, 734 (Del.1988).

45. *Flowers v. State,* 858 A.2d 328, 330 (Del. 2004) (internal quotation marks and citation omitted).

46. 11 *Del. C.* § 3507(a); *Flowers,* 858 A.2d at 330–31.

47. 11 *Del. C.* § 3507 provides: "(a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value; (b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party; (c) This section shall not be construed to affect the rules concerning the admission of statements of defendants or of those who are codefendants in the same trial. This section shall also not apply to the statements of those whom to cross-examine would be to subject to possible self-incrimination."

## VI. The Admissibility of the Video of the Out-of-court Statement

■ Finally, Page contends for the first time on appeal that the trial judge erred by admitting the video of Still's statement as an exhibit after it was determined that the statement itself was admissible. Page argues that the trial judge abused her discretion by departing from the rule this Court announced three years after Page's trial in *Flonnory v. State*.[48] This Court stated in *Flonnory* that:

> As a general matter, recorded or written out-of-court § 3507 statements that are played or read during trial should not be admitted as separate trial exhibits that the jury can take into the jury room during deliberations when all other testimony-including direct and cross-examination testimony of a § 3507 witness, out-of-court § 3507 statements presented by a witness other than the § 3507 declarant, and testimony presented by non § 3507 witnesses-are generally not admitted as separate trial exhibits in transcript form after the witness testifies in court.... The trial judge does, however, have discretion to depart from this default rule when in his judgment the situation so warrants (e.g., where the jury asks to rehear a § 3507 statement during its deliberations *or where the parties do not object to having the written or recorded statements go into the jury room as exhibits*).[49]

We reiterate that Page failed to object at trial to the admissibility of the video of Still's 3507 statement. Our review is for plain error and we do not find it. Even under *Flonnory*, the trial judge in this case would have had the discretion to admit the video of the statement as an exhibit and to send it to the jury room with all other exhibits. Page's argument is without merit.

## VII. Conclusion

The judgments of the Superior Court are **AFFIRMED**.

---

48.  893 A.2d 507, 525–27 (Del.2006).

49.  *Id.* at 526–27 (internal citations omitted) (emphasis added).