Michael JONES, Defendant
Below–Appellant,

v.

STATE of Delaware, Plaintiff
Below–Appellee.

No. 482, 2005.

Supreme Court of Delaware.

Submitted: Sept. 24, 2007.
Decided: Dec. 12, 2007.

2

4

Jerome M. Capone, Esquire (argued) and Kevin J. O'Connell, Esquire, (argued) Wilmington, Delaware, for Appellant.

Timothy J. Donovan, Jr., Esquire (argued) and Thomas E. Brown, Esquire, Department of Justice, Wilmington, Delaware, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice.

Defendant–Appellant Michael Jones appeals his convictions of three counts of Murder First Degree, Robbery First Degree, Arson Second Degree and related weapons and conspiracy charges. Jones was sentenced to three life sentences without parole on the murder convictions.

Jones argues on appeal that his convictions should be reversed because prosecutors exercised their peremptory challenges during jury selection in a racially discriminatory manner. He also argues that the trial judge reversibly erred in admitting

evidence, not sequestering witnesses whose out-of-court statements were in issue, limiting cross-examination, denying his motion to recuse, and in denying his request for a new trial.

We remanded this case [1] for the Superior Court to conduct a complete analysis under *Batson v. Kentucky*.[2] The Superior Court did so and the case has been returned to this Court. After considering the expanded record, we find no merit to Jones's appeal. Accordingly, we affirm.

## I. Background

Jones, a/k/a Gotti, and Darrel Page, a/k/a Quazzi, were members of a drug ring in Wilmington, Delaware. Cedric Reinford, a/k/a Dreds, was the leader of the operation. Sometime in the evening of November 20, 1999, Jones, Page, and Reinford were together in Reinford's car in Wilmington. Jones, born March 14, 1982, was 17 years, 8 months old at that time.

While the three were in Reinford's car, Jones killed Reinford by shooting him three times in the head. Page and Jones then dowsed Reinford and his car with gasoline and set it on fire. Afterwards, they went to Reinford's house to steal drug money from a safe in Reinford's home. There, Jones shot and killed Reinford's fiancée, Maneeka Plant, and shot Reinford's brother, Muhammad, in the face. Muhammad miraculously survived and called 911 at 3:20 a.m. on November 21. Later that day, at the hospital, Muhammad was able to identify both Page and Jones from a photo lineup and told the police what had happened. The subsequent police investigation led the police to question Kim Still, Page's girlfriend. Still told police of Page's plan to kill Reinford and to recruit Jones to help him. She also explained the circumstances surrounding why she drove to Philadelphia to pick up a car borrowed by Page and Jones, what happened when she met up with the two men, and what Page said to Still upon her being told by the police over the phone to return to Wilmington for questioning.

Page was arrested on November 3, 2000. A grand jury indicted Page and Jones on January 29, 2001. Jones was arrested on September 11, 2001 and extradited to Delaware on October 29, 2001.

Jones's trial was originally scheduled to start on November 12, 2002. In a proof positive hearing on January 25, 2002, the State notified the Court and Jones that it intended to seek the death penalty. After a court-ordered stay of all capital murder cases, Jones's trial was rescheduled for November 24, 2003.[3] Shortly before his trial, Jones filed a motion to obtain new counsel, which was granted on November 17, 2003. In April 2004, Jones moved to preclude the State from seeking the death penalty because he was under eighteen at the time of the murders. The trial judge denied this motion on August 31, 2004 based on the doctrine of *stare decisis* and the U.S. Supreme Court's then-current precedent.[4] Jones's trial began January 11, 2005.

1. *Jones v. State,* 938 A.2d 626 (Del.Supr.2007) ("*Jones I*")

2. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

3. The United States Supreme Court decided *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), on June 24, 2002. The consequences of *Ring* and its delay on

Jones's and all capital murder trials were explained in *Page v. State,* 934 A.2d 891 (Del. Supr.2007).

4. *State v. Jones,* 2004 WL 2190097, at *3–5 (Del.Super.) (analyzing *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) and *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)

During jury selection, the State used six of its eight peremptory challenges to remove members of minority groups from the jury. In response to Jones's objections, the prosecutor explained his reasons for the challenges, which the trial judge found to be race neutral.[5] The jury ultimately empaneled found Jones guilty of three counts of Murder First Degree, Robbery First Degree, Arson Second Degree and related weapons and conspiracy charges. Following the penalty phase of Jones's trial, the jury recommended, by a vote of eleven-to-one on two of the Murder First Degree counts and ten-to-two on the third Murder First Degree count, that Jones be sentenced to death. Before sentencing, the U.S. Supreme Court decided *Roper v. Simmons*[6] which made Jones ineligible for the death penalty because of his age. After *Simmons* was decided, but before sentencing, counsel for Jones filed motions for the trial judge's recusal and for a new trial, both of which the trial judge denied. Thereafter, the trial judge sentenced Jones to life imprisonment for each of the murder convictions. This appeal followed.

## II. The *Batson* Challenge

■ Jones first contends that the State exercised its peremptory challenges during jury selection in a racially-discriminatory manner in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution [7] and the Impartial Jury Clause of the Delaware Constitution.[8] We initially found that the trial judge's analysis was incomplete under *Batson v. Kentucky*.[9] We remanded to the Superior Court to make factual findings regarding the presence or absence of discriminatory intent; i.e., whether the jurors were challenged for nondiscriminatory reasons and an assessment of the credibility of the prosecutor's position.

On remand, the Superior Court conducted an evidentiary hearing and analyzed each of the State's challenges.[10] The court considered the credibility of the prosecutor's representations regarding the chal-

and recognizing that the U.S. Supreme Court had just granted *certiorari* to resolve *State ex rel. Simmons v. Roper*, 112 S.W.3d 397 (Mo. 2003)). The trial judge "expressed willingness to delay the trial until after a decision in *Roper* so that the State could avoid the expense of preparing for a penalty phase that might later prove to be meaningless, and so Jones could avoid being tried by a death qualified jury." *State v. Jones*, 2005 WL 950122, at *2 (Del.Super.). Through his counsel, Jones rejected this option. *Id.* On March 1, 2005, the U.S. Supreme Court found the juvenile death penalty irreconcilable with its "evolving standards of decency" interpretation of the Eighth Amendment and thereby deemed it unconstitutional. *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

5. *See Jones I*, 938 A.2d at 629; *State v. Jones*, 2007 WL 2142917 (Del.Super.). These reasons and the trial judge's findings on remand are discussed in Part II of this Opinion.

6. 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

7. U.S. CONST. amend. XIV, § 1.

8. DEL. CONST. Art. I, § 7. Jones's conclusory assertion that the Delaware Constitution has been violated results in his waiving of the State constitutional law aspect of this argument. *See Ortiz v. State*, 869 A.2d 285, 291 n. 4 (Del.2005); *Randall v. State*, 2006 WL 2434912, at *3 (Del.Supr.).

9. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

10. The Superior Court noted that two of the State's peremptory challenges were of white women. The second challenge was of a white female teacher, and the eighth and final challenge was a white woman who was more inclined to give a life sentence than a death penalty. The State had four peremptory challenges remaining when jury selection was completed.

lenges, the composition of the jury pool and the peremptory challenges made by the State, and compared the backgrounds of the challenged panelists against those of similarly empaneled veniremembers who were not challenged.

■ The prosecutor explained that he exercised his first peremptory challenge against Panelist No. 5, a black male, because he was a retired school teacher.[11] In explaining this challenge, the prosecutor testified that he had personal experience as a high school teacher, and typically he would challenge one or more teachers on a jury, but not necessarily all teachers. The court accepted his testimony, concluding that the prosecutor's experiences had made him somewhat ambivalent about his former profession. The court found that the prosecutor's reasons for challenging No. 5 were not pretextual and not race-related.[12]

■ The prosecutor's third peremptory challenge was against Panelist No. 19, a black male. The prosecutor initially sought to have No. 19 removed for cause, but the trial judge did not excuse him and the prosecutor used a peremptory challenge. The court credited the prosecutor's explanation, which was based on No. 19's answers in voir dire and his nine-page criminal record, including numerous arrests and convictions for crimes such as criminal impersonation and forgery.

■ The prosecutor's fourth peremptory challenge was against Panelist No. 25, a black male who had eleven motor vehicle violations and had been arrested for theft and convicted of criminal mischief. The court accepted as credible the prosecutor's representation that criminal activity and not race were his reasons for the challenge.

■ The prosecutor's fifth peremptory challenge was against Panelist No. 52, a black female. The prosecutor explained that he exercised this peremptory challenge because she had an arrest record for possession of heroin and a conviction for shoplifting. Because the case involved drugs, the use of heroin was of particular concern and the prosecutor characterized shoplifting as a crime of dishonesty. The court found the prosecutor's reasoning credible, consistent with his earlier statements, and not pretextual because the evidence at trial did involve drugs and drug transactions.

■ The prosecutor's sixth peremptory challenge was against Panelist No. 61, a clinical psychologist who stated she had a private practice and ran a school. The defense made a *Batson* objection because the woman was hispanic, but the court concluded that she was in fact a white woman and was believed to be such at the time of the peremptory challenge. Even apart from the question of ethnicity, however, the court concluded that the prosecutor had an acceptable and nonpretextual reason for exercising a peremptory challenge. The court accepted the prosecutor's explanation that he challenged No. 61 because the defense would call a clinical psychologist to testify if the case proceeded to a penalty phase. The defense ar-

---

11. The trial judge noted that the State passed on three other teachers, two that were white and one that was black. The State exercised its second peremptory challenge against a white teacher.

12. The Superior Court also found credible the prosecutor's statement that Panelist No. 5 had been arrested by the Fire Marshall's office. The trial judge concluded, however, that in light of the prosecutor's testimony and practice regarding teachers on a jury, that panelist would have been challenged whether or not he had been arrested.

gued that this stated reason was a pretext because the State accepted another psychologist, Panelist No. 116, who was a white male. The court rejected this argument because No. 116 was not a clinical psychologist and because after a clarification of his job duties, the prosecutor was content that No. 116's work was clearly different than that of a clinical psychologist.

■ The prosecutor's seventh peremptory challenge was against Panelist No. 75, a black female. The prosecutor previously had challenged her for cause because of references she made to "circumstantial evidence," which suggested that she might think that evidence could not be sufficient to convict. The trial judge declined to excuse her and the prosecutor then exercised a peremptory challenge. No. 75 also had a 1999 conviction for shoplifting and had been placed on probation in 1995 for shoplifting. The court found that the prosecutor's position was consistent with his previous statements, logical and race-neutral.

■ After considering all the evidence, the Superior Court concluded that the prosecutor's peremptory challenges were for credible, plausible reasons not associated with race, and that no racial discrimination had taken place. The Superior Court noted that the prosecutor had allowed four minorities to be seated on the jury and had four peremptory challenges left when he announced he was content. The defense did not produce any evidence of a policy or practice on the part of the Department of Justice or the prosecutors individually to exclude minorities from juries.

■ In reviewing *Batson* challenges, we determine *de novo* whether the prosecutor offered a race neutral reason for the challenge.[13] If we are satisfied with the race-neutrality of the explanation, we apply a more deferential standard of review to the trial court's ultimate conclusions regarding discriminatory intent.[14] The record of the trial court's credibility determinations facilitates appellate review of the *Batson* challenges, and the trial court's findings with respect to discriminatory intent will stand unless they are clearly erroneous.

Although Jones made a prima facie showing under *Batson*,[15] we are satisfied that a complete *Batson* analysis shows no constitutional violation. We find, as did the trial judge, that the prosecutor articulated a credible race-neutral explanation for each of his peremptory challenges. On remand, the Superior Court evaluated all of the evidence after a hearing and found no discriminatory intent. The Superior Court's finding of fact is supported by the record and is not clearly erroneous. Accordingly, Jones's *Batson* claim is without merit.

### III. Admissibility of Evidence Challenges

■ Jones makes two arguments related to the admissibility of evidence. We review a trial judge's evidentiary rulings for abuse of discretion.[16] To the ex-

---

13. *Jones I*, 938 A.2d at 631; *Barrow v. State*, 749 A.2d 1230, 1238 (Del.2000).

14. *Jones I*, 938 A.2d at 631 ("If we are satisfied with the race-neutrality of the explanation, the trial court's finding with respect to discriminatory intent will stand unless it is clearly erroneous.").

15. *See id.* ("The defendant has met his initial burden of making a *prima facie* showing that the State purposefully exercised its peremptory challenges in a racially discriminatory manner.").

16. *Smith v. State*, 913 A.2d 1197, 1228 (Del. 2006); *Johnson v. State*, 878 A.2d 422, 427 (Del.2005).

tent that the ruling pertains to an alleged constitutional violation, we review *de novo.*[17] When a defendant fails to make a timely objection to the evidence, however, we review only for plain error.[18]

### A. Still's § 3507 Statements

Jones first contends that the trial judge erred by admitting § 3507 statements[19] Still made to the police during their investigation of Jones and his co-conspirator, Page.[20] Jones complains about two categories of statements made by Still during her interrogation. The first consists of her comments regarding what Page told her in the weeks leading up to the homicide, including his intent to enlist Jones to commit murder. The second category includes statements Page made to Still after the murders, which implied that Jones was "da man" for committing them. For both categories of statements, Jones argues that the statements Page allegedly made to Still are hearsay within hearsay without any exception, are unduly prejudicial within the meaning of D.R.E. 403(b), and violate his rights to confront Page under the Confron-

tation Clauses of the U.S. and Delaware constitutions.[21]

"Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule...."[22] The outer layer of hearsay (Still's out-of-court statement to the police) was admissible under § 3507 because Still testified and was subject to cross examination at trial. The trial judge found that the inner layer of hearsay fell within specific hearsay exceptions.[23] The trial judge admitted the first category of statements under D.R.E. 803(3) as present-sense mental impressions, after considering the five factors outlined in *Derrickson v. State.*[24] She also considered the context of the statements and found that they were not backward-looking, memory-based statements that would be hearsay outside of Rule 803(3)'s exception.[25] We find no abuse of discretion.

The trial judge found the second category of statements to be admissible as statements of a co-conspirator in furtherance of the conspiracy under D.R.E. 801(d)(2)(E). The court determined that

17. *Johnson,* 878 A.2d at 427.

18. *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986).

19. 11 *Del. C.* § 3507.

20. Jones does not take issue with whether or not Still's statements were made voluntarily or otherwise did not meet the requirements of 11 *Del. C.* § 3507.

21. Jones also makes a conclusory allegation that his rights are violated under the Delaware Constitution and we need not address this allegation as a result. *See supra* note 8.

22. D.R.E. 805; *Demby v. State,* 695 A.2d 1152, 1162 (Del.1997).

23. *State v. Jones,* 2004 WL 2914276, at *1 (Del.Super.).

24. 321 A.2d 497 (Del.1974). Under *Derrickson,* in order for present sense-mental impressions to be admitted, (1) the statement must be relevant and material; (2) it must relate an existing state of mind when made; (3) it must be made in a natural manner; (4) it must be made under circumstances dispelling suspicion; and (5) it must contain no suggestion of sinister motives. *Id.* at 503.

25. *See Capano v. State,* 781 A.2d 556, 618 (Del.2001) (stating that "standing alone, the hearsay testimony [in this case] is a fact remembered or believed and is outside the Rule 803(3) exception"); *Reyes v. State,* 819 A.2d 305, 314 (Del.2003) (discussing *Capano* and reaffirming that "a declaration of past events is generally not admissible").

the conspiracy was ongoing at the time the statements were made because the money taken from Reinford's home had not been divided.[26] Alternatively, the trial judge determined that the statements were made in furtherance of the conspiracy because Still was told during the conversation to return the car to Delaware so the police would be unable to track them.[27]

 "Generally, a conspiracy terminates upon accomplishment of the principal objective unless evidence is introduced indicating that the scope of the original agreement included acts taken to conceal the criminal activity."[28] This Court has stated that "statements made after the robbery but before the proceeds were divided are made 'in furtherance of the conspiracy.'"[29] Thus, Page's statements to Still were admissible pursuant to D.R.E. 801(d)(2)(E). Moreover, the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice.[30]

Although the statements were admissible under the Rules of Evidence, that does not necessarily dispose of Jones's argument under the Sixth Amendment of the U.S. Constitution, which requires that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."[31] In *Crawford v. Washington*[32] the U.S. Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."[33] The U.S. Supreme Court held in *Davis v. Washington*[34] that statements are "testimonial when the circumstances objectively indicate that there is no ... ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."[35]

 Section 3507 statements may be "testimonial" under *Davis*. For an out-of-court statement to be admitted as affirmative evidence under § 3507, the witness must be present at trial and subject to cross-examination.[36] Still testified in this

26. *State v. Jones*, 2004 WL 2914276, at *4 (Del.Super.).

27. The trial judge summarized the statements that Page made to Still during the escape as, "Jones, are you satisfied with last night's take? You are the man. Still, hold your head on straight. You and the police don't know anything. I only asked you to help with the car because Jones and I can't go to Delaware." *Jones*, 2004 WL 2914276, at *4.

28. *Reyes*, 819 A.2d at 312.

29. *Hackett v. State*, 1999 WL 624108, at *3 (Del.Supr.) (quoting *Williams v. State*, 494 A.2d 1237, 1242 (Del.1985)).

30. D.R.E. 403.

31. U.S. Const. amend. VI.

32. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

33. *Id.* at 53–54, 124 S.Ct. 1354.

34. 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

35. *Id.* at 2273–74.

36. 11 *Del. C.* § 3507 provides: "(a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value; (b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party; (c) This section shall not be construed to affect the rules concerning the admission of statements of defendants or of those who are codefendants in the same trial. This section shall also not apply to the state-

case and Jones's counsel cross-examined her. Accordingly, there was no violation of Jones's Sixth Amendment right to confront Still as a witness against him.[37]

Jones argues, nevertheless, that his right to confrontation was violated because he could not confront Page and cross-examine him about the statements Page allegedly made to Still. Jones relies on *Floudiotis*[38] for the proposition that "the admission of a non-testifying co-defendant's statement that tends to incriminate the defendant violates the Confrontation Clause."[39] Our opinion in *Floudiotis* also recognized, however, that "Confrontation Clause issues ... may not be applicable" when a statement of a co-conspirator is admitted under D.R.E. 801(d)(2)(E).[40]

▇▇▇▇▇ Although *Crawford* "[left] for another day any effort to spell out a comprehensive definition of 'testimonial,' "[41] *Davis* provides guidance on the distinction between testimonial and nontestimonial statements:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no ... ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[42]

Thus, under *Crawford* and *Davis*, a statement is testimonial and implicates the Confrontation Clause where it is given in non-emergency circumstances and the declarant would recognize that his statements could be used against him in subsequent formal proceedings.[43] By contrast, "a casual remark to an acquaintance" is a nontestimonial statement.[44] Similarly, as the U.S. Supreme Court recognized in *Crawford*, statements made in furtherance

ments of those whom to cross-examine would be to subject to possible self-incrimination."

**37.** *Johnson v. State*, 878 A.2d 422, 429 (Del. 2005).

**38.** *Floudiotis v. State*, 726 A.2d 1196 (Del. 1999). *See also Barrow v. State*, 749 A.2d 1230, 1242–48 (Del.2000).

**39.** *Floudiotis*, 726 A.2d at 1211.

**40.** *Id.* at 1212.

**41.** *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354. *See id.* ("Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.").

**42.** *Davis*, 126 S.Ct. at 2273–74. In making this statement, the U.S. Supreme Court acknowledged that "[t]his is not to imply ...

that statements made in the absence of any interrogation are necessarily nontestimonial." *Id.* at 2274 n. 1.

**43.** *See id.* ("[E]ven when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate."). *Cf. id.* at 2274 n. 2 ("[O]ur holding today makes it unnecessary to consider whether or when statements made to someone other than law enforcement personnel are 'testimonial.' "). *See Crawford*, 541 U.S. at 51, 124 S.Ct. 1354 ("On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.").

**44.** *See Crawford*, 541 U.S. at 51, 124 S.Ct. 1354 ("An accuser who makes a formal statement to government officers bears testimony in the sense that a person who makes a casual remark to an acquaintance does not.").

of a conspiracy are nontestimonial.[45] Here, Page's statements were nontestimonial in nature because they were casual remarks made to his girlfriend (Still). Although Still revealed these statements in a testimonial setting, this did not change the nature of Page's statements to her. We find no merit to Jones's argument because neither Page's statements showing his state of mind, nor his statements in furtherance of the conspiracy, were "testimonial" within the meaning of *Crawford* and *Davis*.[46] Consistent with these cases, Page's nontestimonial statements to Still are subject only to our State's hearsay rules because they do not implicate the Confrontation Clause.[47] We have already concluded that the statements were properly admitted under our Rules of Evidence. Accordingly, Jones's arguments are without merit.

## B. The Video of Still's § 3507 Statements

 Next, Jones argues for the first time on appeal that the trial judge erred by allowing the State to introduce the actual video of Kim Still's § 3507 statement into evidence as a trial exhibit. Because Jones failed to object, we may reverse only if the plain error is "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[48] A panel of this Court recently addressed this identical claim in *Page v. State:*[49]

> As a general matter, recorded or written out-of-court § 3507 statements that are played or read during trial should not be admitted as separate trial exhibits that the jury can take into the jury room during deliberations when all other testimony—including direct and cross-examination testimony of a § 3507 witness,

**45.** *See id.* at 56, 124 S.Ct. 1354 ("Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy."). *Cf. id.* ("[A]ccomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule.") (quoting *Lilly v. Virginia*, 527 U.S. 116, 134, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)). *See generally id.* at 59 n. 9, 124 S.Ct. 1354 ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").

We also note that some courts after *Crawford* have found that statements made under the "state of mind" exception are not "testimonial" for purposes of confrontation. *See Horton v. Allen*, 370 F.3d 75, 84 (1st Cir.2004) (holding that a statement from a conversation, admitted under the state-of-mind exception to the hearsay rule, was nontestimonial because it was private, not made under examination, not contained in a formalized document such as an affidavit, deposition or prior testimony transcript, and not made "under circumstances in which an objective person would reasonably believe that the statement would be available for use at a later trial") (internal quotation marks omitted); *State v.*

*Johnson*, 2005 WL 1952939 (Del.Super.) (analyzing statements under D.R.E. 803(3) to determine whether "a reasonable person in the position of the declarant would think that his or her statement likely was to be used in the course of investigating and prosecuting a criminal act," which may implicate *Crawford*). Here, the *Crawford* threshold is not reached because none of Page's statements are testimonial.

**46.** Because we hold that Page's statements are not testimonial, we need not address a harmless error analysis.

**47.** *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-as does [*Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.").

**48.** *Wainwright v. State*, 504 A.2d 1096, 1100 (Del.1986).

**49.** 934 A.2d 891 (Del.Supr.2007).

out-of-court § 3507 statements presented by a witness other than the § 3507 declarant, and testimony presented by non § 3507 witnesses—are generally not admitted as separate trial exhibits in transcript form after the witness testifies in court. . . . The trial judge does, however, have discretion to depart from this default rule when in his judgment the situation so warrants (e.g., where the jury asks to rehear a § 3507 statement during its deliberations or where the parties do not object to having the written or recorded statements go into the jury room as exhibits).[50]

As in *Page*, there was no objection, and the trial judge here exercised her discretion to allow the statement into evidence. Jones's claim of plain error fails.

### IV. The Refusal to Sequester § 3507 Witnesses under *Barnes*

 Jones next argues that the trial judge should have sequestered two witnesses while the police officer testified about the content and voluntariness of their § 3507 statements. During trial, Jones sought to have Still and Muhammad Reinford sequestered during the testimony of the police officer who interrogated them. We review the trial judge's decision to exclude or not exclude witnesses for abuse of discretion.[51]

Section 3507 requires the declarant to be present and subject to cross-examination if his pretrial statements are going to be admitted into evidence.[52] In *Barnes v. State*,[53] we held that there is an "explicit requirement that the declarant be 'present' during the admission of an out-of-court pretrial statement."[54] The parties argued during trial that the "presence" requirement, as explained in *Barnes*, is ambiguous. The trial judge agreed, but believed that the witnesses could have been present during the entire cross-examination, including beyond the § 3507 aspect of it. The witnesses, however, were only present for the § 3507 testimony.

Jones's argument that the witnesses should have been sequestered is not supported by *Barnes*. In *Barnes*, we held that the trial judge erred by admitting the contested § 3507 statement because the declarant was not "present" during the officer's testimony. Nonetheless, sufficient, independent evidence fully supported that conviction.[55] The record shows that one of the § 3507 witnesses was present only to hear his statement and the officer's testimony about its voluntariness and the circumstances in which it was voluntarily given.[56] For the other witness, the record shows a similar occurrence.[57]

---

**50.** *Page*, 934 A.2d at 901 (quoting *Flonnory v. State*, 893 A.2d 507, 526–27 (Del.2006)) (emphasis omitted).

**51.** *Taylor v. State*, 849 A.2d 405, 408 (Del. 2004); D.R.E. 615.

**52.** 11 *Del. C.* § 3507(a).

**53.** 858 A.2d 942 (Del.2004).

**54.** *Id.* at 946.

**55.** *Id.*

**56.** To the extent that he also heard two questions unrelated to the substance or voluntariness of his § 3507 statements, there is no

error because the trial judge has discretion to exclude witnesses under D.R.E. 615. Even assuming that the trial judge abused her discretion, which she did not, any error would have been harmless beyond a reasonable doubt because the witness would have had no knowledge or foundation to have answered those questions. Further, the questions, even if asked of him, would have been irrelevant to assess his credibility or impeach him.

**57.** It appears the only questions asked of the officer in that witness's presence dealt with the voluntariness of her statement.

■ Contrary to Jones's interpretation of *Barnes*, "present" for purposes of § 3507 requires the declarant be present for the statement itself and for the testimony about its voluntariness (including any surrounding circumstances relating to voluntariness). As the Court explained in *Barnes*, the presence requirement allows the declarant to "be in a position to respond to questions on cross or direct about the substance [of the statement and] for the context in which the statement was made as represented by the State's witness offering his hearsay version." [58] The trial judge did not abuse her discretion in declining to sequester the witnesses during the police officer's testimony about the content and voluntariness of their § 3507 statements.[59]

## V. Restriction on Certain Witness Testimony

■ The limitation a trial judge puts on the examination of a witness is an evidentiary ruling which we generally review for abuse of discretion.[60] Jones raises two claims of abuse of discretion with the trial judge's rulings with regard to the testimony of two prosecution witnesses, Officer Anthony DiNardo of the New Castle County Police Department and Yolanda Lum.

■ Officer DiNardo testified for the State that he collected over 800 vials of marijuana in plain view of the basement in which Muhammad Reinford (the murder victim's brother) lived. On cross-examination, defense counsel for Jones asked Officer DiNardo if Reinford had ever been prosecuted for any offense related to the marijuana. The State objected on relevance grounds,[61] and Jones's counsel responded that it was relevant to show whether Reinford had any bias against the State. After a brief discussion, the trial judge ruled that the inquiry was irrelevant. According to Jones's counsel, he drafted an unopposed motion *in limine* seeking the opportunity to explore Reinford's bias. After reviewing the motion, the trial judge stated, "I wanted to clarify that my [DiNardo] ruling had nothing to do with relevance when it dealt with the police officer, or the detective. It was the fact that there was no foundation for whether he could or could not make charges in the decision."

Jones argues that the trial judge abused her discretion in preventing his line of questioning related to Reinford's bias during DiNardo's testimony. The State counters that Jones had the opportunity to impeach during Reinford's cross-examination, and further, the fact that Reinford had not been charged with drug offenses was placed before the jury through the testimony of another officer.

■ It is well-settled that the bias of a witness is subject to exploration at trial and is "always relevant as discrediting the witness and affecting the weight of the testimony." [62] While the trial judge may exercise her discretion to limit the extent of such evidence of bias, she cannot

---

58. *Barnes*, 858 A.2d at 946.

59. The State conceded to Jones's request to sequester Reinford for the remaining non-§ 3507 parts of the officer's testimony.

60. *See Johnson v. State*, 878 A.2d 422, 425 (Del.2005); *Hardin v. State*, 844 A.2d 982, 987 (Del.2004); *Williamson v. State*, 707 A.2d 350, 359 (Del.1998).

61. The State also implied that the witness may not have been competent to answer because he did not know whether Reinford was prosecuted or not.

62. *Weber v. State*, 457 A.2d 674, 680 (Del. 1983) (citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).

foreclose a legitimate inquiry into a witness' credibility.[63] The objective with this form of impeachment "is to uncover any incentive a witness might have to testify falsely."[64]

Here, the record shows that Jones's counsel was attempting to impeach the credibility of Reinford's testimony before Reinford testified. Counsel did not lay a foundation for this question, nor was it relevant for the purposes for which he was offering it. The testimony Jones sought to introduce during Officer DiNardo's cross-examination was not probative of a motive for Officer DiNardo to testify falsely. A trial judge has discretion to exercise reasonable control over the mode and order of the interrogation of witnesses.[65] This includes limiting the scope of cross-examination to "the subject matter of the direct examination and matters affecting the credibility *of the witness.*"[66] The witness was Officer DiNardo, not Reinford. We find no abuse of discretion.

Additionally, it is apparent from the record that the jury ultimately knew that Reinford was not charged. Officer Gary Taylor, another prosecution witness, testified that a large quantity of marijuana was found at the Reinford residence and that he never considered charging Reinford with any drug crimes because he was there to conduct a homicide investigation. Further, in anticipation of a defense argument that Reinford may have had bias, Officer Taylor testified that he was not a party to any discussion regarding prosecuting Reinford for a drug crime. Officer Taylor also testified that he never discussed with Reinford the possibility of being charged. Reinford testified that he had smoked marijuana that night, but that it did not impair his faculties. The jury heard testimony from which they could infer that Reinford was not charged with any marijuana offense. Even if the limitation on Jones's cross-examination of Officer DiNardo was error—and it was not—the error was clearly harmless.[67]

Jones next argues that the trial judge erred in restricting the cross-examination of Yolanda Lum, a drug dealer who worked for Page. At the time of her testimony, Lum had charges pending against her. The trial judge denied Jones the ability to impeach Lum under D.R.E. 609 because her pending charges were not "convictions." This Court has previously explained that D.R.E. 609(a) prevents the admissibility of evidence of charges that are pending.[68] Rule 608(b), however, permits the trial judge discretion to allow a party to use specific instances of misconduct "if probative of truthfulness or untruthfulness" to attack a "witness' character for truthfulness or untruthfulness" on cross-examination.[69] In her ruling, the trial judge permitted Jones to question Lum's bias toward the State in ways other than mentioning that she had a charge pending. This limitation was short-lived.

63. *Id.* at 680.

64. *Williamson,* 707 A.2d at 361.

65. D.R.E. 611(a).

66. D.R.E. 611(b) (emphasis added).

67. *See Van Arsdall v. State,* 524 A.2d 3, 10 (Del.1987).

68. *Crawley v. State, 1991* WL 165569, at *3 (Del.Supr.). *See also Smart v. State,* 1986 WL 17456, at *2 (Del.Supr.) (finding that the existence of pending charges was irrelevant to bias when there was no basis for the belief that the prosecution had afforded the witness favorable treatment or assistance in connection with any pending charges).

69. *Crawley,* 1991 WL 165569, at *3; D.R.E. 608(b).

The following day, the State reassessed its earlier position and sought to recall Lum as a witness to introduce the evidence of her arrests and pending charges for purposes of credibility.[70] The trial judge allowed the State to recall Lum. Jones's counsel requested to cross-examine her about the charges first. The trial judge properly denied that request, since she had discretion to allow the State to question its witness first.[71] After the State questioned Lum about her arrests and pending charges, Jones chose not to cross-examine her at all. Because Jones ultimately had the opportunity to cross-examine Lum on the same subject matter without limitation, his argument on appeal lacks merit.

## VI. The Arson Scene Photographs

Jones argues that the trial judge erred by admitting photographs depicting the remains of Reinford's car and charred body on the basis that they were cumulative and unduly prejudicial. This identical argument was raised and rejected in *Page*.[72] In both cases, the trial judge allowed the photographs into evidence. Trial judges have very broad discretion in deciding whether to admit photographic evidence of victims' injuries.[73] Jones's indictment included a charge of Arson Sec-

ond Degree. The State had the burden to prove this charge beyond a reasonable doubt. Although Jones submits that during opening arguments his attorney stated that the arson charges were not at issue in the case and he did not challenge them, this concession does not relieve the State of its burden. Nor were Jones's attorneys' statements evidence.[74] It was not an abuse of discretion for the trial judge to conclude that the photographs had probative value that was not substantially outweighed by the danger of unfair prejudice.

## VII. Denial of the Motion to Recuse

Jones argues that the trial judge abused her discretion in denying his motion to recuse. We review the subjective aspect of this decision for abuse of discretion and the objective portion *de novo*.[75]

Judicial impartiality is a "fundamental principle of the administration of justice."[76] A party "is entitled to neutrality on the part of the presiding judge but the standards governing disqualification also require the appearance of impartiality."[77] Canon 3C of the Delaware Code of Judicial Conduct (the "Code") "places upon the judge the direct responsibility to avoid participation in proceedings through the exercise of disqualification whenever the judge's impartiality might reasonably be questioned."[78]

---

70. The State noted that the jury was already aware that she was a drug dealer so any insight into the fact that she had pending charges would be minimally prejudicial.

71. D.R.E. 611(a).

72. *Page v. State*, 934 A.2d 891, 899 (Del. Supr.2007).

73. *Ortiz v. State*, 869 A.2d 285, 294 (Del. 2005).

74. *Taylor v. State*, 777 A.2d 759, 766 n. 23 (Del.2001) ("Arguments made by counsel during opening statements and summation are not evidence and thus cannot be said to raise an affirmative defense."). *See also King v.*

*State*, 2007 WL 2949146, at *2 (Del.Supr.) ("Defense counsel's question putting the proposition to her does not constitute evidence.").

75. *Stevenson v. State*, 782 A.2d 249, 255 n. 2 (Del.2001).

76. *Los v. Los*, 595 A.2d 381, 383 (Del.1991).

77. *Id.*

78. *Stevenson*, 782 A.2d at 255. *See also Los*, 595 A.2d at 384; Delaware Judges' Code of Judicial Conduct Canon 3 C(1)(a).

██ Although the Code sets forth specific instances prompting disqualification, it does not "exhaust all situations in which a judge's impartiality may be questioned." [79] Thus, when confronted with a motion to recuse, the trial judge must engage in a two-step analysis to determine whether disqualification is appropriate. The first step requires the judge to be subjectively satisfied that she "can proceed to hear the cause free of bias or prejudice concerning that party." [80] Even if the judge is satisfied that she can proceed to hear the matter free of bias or prejudice, the second step requires the judge to examine objectively "whether the circumstances require recusal because 'there is an appearance of bias sufficient to cause doubt as to the judge's impartiality.' " [81] On appeal, we review the trial judge's analysis of the subjective test for abuse of discretion. [82] Because a claim of appearance of impropriety "implicates a view of how others perceive the conduct of the trial judge," we review the merits of the objective test *de novo*. [83]

██ Here, counsel for Jones filed a Motion to Recuse and a Motion for a New Trial on March 16, 2005. [84] The facts surrounding the motion to recuse and her reasons for denying it are outlined at length by the trial judge in her written order denying both motions. [85] We summarize them here.

In a side-bar scheduling discussion during the penalty phase of Jones's trial on February 14, the trial judge refused to grant defense counsel's request for a full day recess. [86] In response to this denial, counsel "launched into a heated tirade that accused the Court of favoring the prosecution." [87] The next day, the trial judge was overheard talking in a restaurant. A witness provided an affidavit attesting that the trial judge "was angry due to something that occurred at 'sidebar' with this defense attorney." [88] According to the affidavit, the trial judge used profanity when referring to counsel and said that she "would get the last word and that man on

79. *Stevenson*, 782 A.2d at 255; *see Los*, 595 A.2d at 384.

80. *Los*, 595 A.2d at 384–85; *see Stevenson*, 782 A.2d at 255; *Jackson v. State*, 684 A.2d 745, 752–53 (Del.1996).

81. *Stevenson*, 782 A.2d at 255 (quoting *Los*, 595 A.2d at 385).

82. *Id.* at 255. In *Los*, we also explained the importance of finding actual bias against a party to prevent a litigant from "judge shopping" through the disqualification process. *Los*, 595 A.2d at 385.

83. *Stevenson*, 782 A.2d at 255 n. 2.

84. The jury panel was sequestered on February 17, and returned with a verdict on February 18.

85. *State v. Jones*, 2005 WL 950122 (Del.Super.). Because the only reason cited for the Motion for New Trial was the trial judge's

bias, she disposed of both motions with the recusal test. *Id.* at *5.

86. Part of the reason the trial judge denied the motion was because she had already granted Jones's defense co-counsel's request for a two-day recess during the guilt phase so that he could collect a contingency fee. *Jones*, 2005 WL 950122, at *3. After being granted this motion, co-counsel requested a third day, which the court denied. Consequently, "[Defense co-counsel] responded with such contemptuous body language that members of the gallery, viewing him only from the back, later commented about it. When this tactic also failed, [defense co-counsel] followed the Court up to chambers, attempting to continue the argument *ex parte*. The Court refused to have any further discussion on the issue." *Id.*

87. *Id.*

88. *Id.* at *5.

trial would get the death penalty." [89]

The trial judge, in her order denying Jones's motions, rejected this account. She admitted to expressing her sentiment that night about the "bitter and recriminating" sidebar at the restaurant. Additionally, she agreed with the affiant that she had exhibited "extreme animosity" toward defense counsel at sidebar and that she remained angry over defense counsel's behavior for some time after the events on February 14. However, she vehemently denied the affiant's claim that she was going to issue a death sentence. In particular, she stated the following explanation as to the context behind the restaurant conversation:

My "animosity toward [defense counsel], which would be more accurately termed disappointment, is not a reasonable basis for assuming I was biased against his client. The aforementioned instances ... provide a more than reasonable basis for the Court to have become dissatisfied with the way [defense counsel] tried this case. That feeling, however, sprang from the Court's judicial desire to ensure that Jones received a fair penalty hearing. I also had a strong personal desire to avoid a recommendation from the jury so strong that failure to issue a death sentence would appear to substitute my opinion of the juvenile death penalty for that of the law of Delaware and the conscience of the community. I did not intend to use my disappointment with [defense counsel] as an excuse to impose the death penalty regardless of Jones' mitigating evidence. Instead, I was dissatisfied with [defense counsel] because his poor performance made it practically inevitable that the

jury would strongly vote death, a recommendation that I would have probably had to follow regardless of my personal convictions.[90]

She further defended her conversation because "it is simply too much to ask that a judge not utter a word to anyone about a case that may extend, like this one, for months, and to completely abstain from the support of family and friends when faced with difficult legal and moral decisions on matters of life and death." [91]

 While we do not require that a judge be silent with family about events occurring in her courtroom, it was inappropriate for the trial judge to discuss the case in a public setting where she could be overheard and misconstrued. Notwithstanding that, we accept the trial judge's representations regarding what occurred and her lack of bias. We find no abuse of discretion in her analysis of the subjective test.

Addressing the objective test, we do not find an appearance of bias sufficient to cause doubt as to the trial judge's impartiality. Any issue of bias in favor of the death penalty is moot because a life sentence was in fact imposed. Accordingly, we find no error in the denial of Jones's motion to recuse.

## VIII. Denial of the Motion for New Trial

 Lastly, Jones argues that the trial judge erred in denying his motion for a new trial. We review denials of these motions for abuse of discretion.[92] The crux of Jones's motion for a new trial was that the trial judge was biased. Because we have already found that the trial judge

**89.** *Id.*

**90.** *Id.* at *6.

**91.** *Id.* at *7.

**92.** *Hicks v. State*, 913 A.2d 1189, 1193 (Del. 2006).

did not err in denying the motion to recuse, there was no abuse of discretion in denying Jones's motion for a new trial.

### IX. Conclusion

The judgments of the Superior Court are **AFFIRMED.**