IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| GORDON HILL,[1] | § |
| | § No. 247, 2023 |
| Respondent Below, | § |
| Appellant, | § Court Below—Family Court |
| | § of the State of Delaware |
| v. | § |
| | § File No. CS09-02798 |
| CHARLOTTE FOX, | § Petition Nos. 22-04390 |
| | §            22-11833 |
| Petitioner Below, | § |
| Appellee. | |

Submitted: December 8, 2023
Decided:    February 12, 2024

Before **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices.

## **ORDER**

After considering the parties' briefs and the record on appeal, it appears to the Court that:

(1)     The appellant ("Father") and the appellee ("Mother") are the parents of a child born in 2009 ("Child"). Father filed this appeal from a Family Court order resolving (i) a petition in which Mother sought to modify a prior Family Court order regarding custody, residential placement, and visitation with the Child; and (ii) a petition in which Father sought a finding that Mother was in contempt of the prior order. For the reasons discussed below, we affirm.

---

[1] The Court previously assigned pseudonyms to the parties under Supreme Court Rule 7(d).

(2)     The parties have litigated matters relating to custody, residential placement, and visitation with the Child since he was born.  The Family Court entered an order on April 15, 2021, after a trial on the merits (the "2021 Order").  The 2021 Order provided that the parties would have joint custody; Mother would have primary placement during the school year and Mother and Father would have shared placement on an alternating weekly basis during the summer; and Father would have visitation every weekend from Friday evening to Sunday evening during the school year.[2]

(3)     On March 4, 2022, Mother filed a petition for an order of protection from abuse ("PFA") against Father.  Mother alleged that Father was verbally abusive and had recently grabbed the Child by his shirt and threatened to knock him out.  Mother asserted that the Child had expressed suicidal ideations because of Father's conduct.  The court entered a temporary *ex parte* order prohibiting Father from having contact with the Child until the PFA hearing.  Following the PFA hearing on March 31, 2022, a Family Court Commissioner denied Mother's PFA petition, finding that Mother had failed to prove by a preponderance of the evidence that Father had committed an act of abuse.

---

[2] These provisions for custody, residential placement, and visitation were consistent with the provisions established by the Family Court in a February 2, 2018 order, after a full hearing on the merits on the parties' cross-petitions to modify custody.  The Family Court had also entered an order making slight modifications, such as to specify pickup times and locations, on October 22, 2019.

(4) On March 7, 2022, a few days after filing the PFA petition but before the PFA hearing, Mother filed a petition to modify the 2021 Order. The petition, which Mother filed *pro se*, alleged that the Child would be mentally or physically abused unless the court modified the 2021 Order. Father, who was represented by counsel, then filed a petition asserting that Mother was in contempt of the 2021 Order because she had not allowed the Child to visit Father on the weekends of April 1 and 8, 2022.[3]

(5) Following a case management conference on August 31, 2022, at which both parties were represented by counsel, the Family Court scheduled trial for April 26, 2023. In November 2022, the Family Court granted Father's counsel's motion to withdraw from the representation. Before trial, Father filed a motion seeking to have the Child testify as a witness at trial, rather than having the court conduct a child interview as it had in prior disputes between the parties. The court granted the motion, directing that the Child would be the first witness so that he could return to school after he testified.

(6) On April 14, 2023, Father filed a motion seeking to exclude the testimony of two witnesses—a Division of Family Services ("DFS") employee and the Child's counselor, Dr. Turley—on the basis that Mother had identified them as

---

[3] The Child had missed other weekend visits under the temporary *ex parte* order that was in effect while the PFA was pending.

witnesses after the deadline for doing so.  In response, Mother acknowledged that she had provided her witness list after the deadline but argued that the challenged witnesses should be permitted to testify because Father was aware of their involvement.  The court denied Father's motion at the beginning of trial, concluding that precluding the challenged witnesses' testimony would be unwarranted because the record reflected that Father was aware of the witnesses' involvement in the Child's case and treatment.  As to Dr. Turley specifically, the Family Court found that (i) there had been communications regarding Dr. Turley's involvement with the Child when both of the parties were represented by counsel, including with respect to Dr. Turley's change in employment from one practice to another; (ii) at the custody-modification trial in April 2021, Mother had testified that she had enrolled the Child in counseling with Dr. Turley after the Child made suicidal statements, and Father had stated that he was "glad to hear" that the Child was in counseling; and (iii) Dr. Turley's continued counseling of the Child had been mentioned on the record during the August 31, 2022 case-management conference, in which Father had participated.

(7)     During the full-day trial on April 26, 2023, the Family Court heard testimony from the Child, Dr. Turley, a DFS employee, Mother, and Father.  The court admitted into evidence various documents, including certain notes in the Child's handwriting; the Child's report cards dated August 15, 2022, and March 9,

4

2023; the transcript of the March 2022 PFA hearing; Dr. Turley's notes from meetings with the Child between January 2021 and June 2022; posts from Mother's Facebook accounts or those of her family members; texts between Mother and Father and between the Child and Father; documents reflecting Father's relationship with the Child, such as Father's Day cards; and an article that Father submitted entitled "How the Family Court System Fails Black Fathers—and How You Can Help." The court admitted many of the exhibits at Father's request and over Mother's objection.

(8)     On June 26, 2023, the Family Court entered an order granting Mother's petition to modify the 2021 Order. Applying 13 *Del. C.* § 729(c)(1), the court determined that Mother had established that continued enforcement of the 2021 Order would endanger the Child's physical health and significantly impair his emotional development. The court found that the teenaged Child was fearful of and resistant to having contact with Father, as evidenced in part by the Child's demeanor on the stand and his testimony regarding an incident around the beginning of March 2022. During that incident, according to the Child, Father went "on a rant" about Mother not loving the Child and only using him for child-support money. Father then grabbed the Child by the shirt and threatened to beat the Child up if he told Mother what Father had said. The court found that Dr. Turley's testimony corroborated that the Child feared contact with Father. Dr. Turley testified that he and the Child had discussed difficulties in the Child's relationship with Father during

5

counseling sessions in 2021 and 2022, during which the Child frequently became tearful and emotional and expressed fear and resistance to visiting with Father.[4] The court ordered that the parties would continue to have joint legal custody and Mother would continue to have primary residential placement. The court modified Father's visitation, however, ordering that Father's future contact with the Child would occur in a therapeutic setting, with the assistance of either Dr. Turley or another professional selected according to a procedure set forth in the order. The order further provided that if the parties were unable or unwilling to participate in a therapeutic reunification or visitation program, then Father's visitation with the Child would occur at Mother's discretion, taking into consideration the Child's best interests, including his wishes.

(9) As to Father's contempt petition, the Family Court declined to find Mother in contempt of the 2021 Order. The court stated that Father had the burden of establishing by a preponderance of the evidence that (i) a valid court order was in

---

[4] In its decision, the Family Court also quoted a letter that it received from Father shortly after trial. In the letter, which was addressed to the Family Court judge in this case and the Chief Judge, Father wrote, among other things, that the Child "is to have NO MORE CONTACT with me at all. UNDER NO circumstance!! After the lies and disrespect he displayed yesterday he is not MY SON!! I'm making this very clear. If I was the only parent he thought he had left the State don't contact me put him in foster care or adoption . . ." File No. CS09-02798, Petition Nos. 22-04390, 22-11833, Custody Modification Contempt/Rule to Show Cause Decision and Order, at 28 (Del. Fam. Ct. June 26, 2023). Father argues on appeal that the Family Court erred by sending a copy of the letter to Mother and her counsel. His contention is without merit, as the Family Court did not err by providing a party with a copy of *ex parte* correspondence that it received from an opposing party. Moreover, although the court noted the receipt of the letter and quoted its contents in its decision, the court did not treat the letter as a concession by Father or give it any particular weight.

6

effect; (ii) Mother had notice of and the ability to abide by the order; and (iii) Mother nevertheless violated the order in a meaningful way.[5] The court concluded that Mother did not have the ability to comply with the visitation provisions of the 2021 Order, "given [the Child's] age and clearly expressed fear and resistance to visitation with Father," and therefore had not violated the order in a meaningful way.[6]

(10)   In his appeal to this Court, Father argues that the Family Court erred by (i) failing to apply the best-interests factors under 13 *Del. C.* § 722; (ii) denying a motion for recusal that Father filed in November 2022; and (iii) relying on inconsistent, insufficient, and inadmissible evidence.

(11)   On appeal, this Court reviews the Family Court's factual and legal determinations as well as its inferences and deductions.[7] We review legal rulings *de novo*.[8] Findings of fact will not be disturbed unless they are clearly erroneous and justice requires that they be overturned.[9] On issues of witness credibility, we will not substitute our judgment for that of the trier of fact.[10] "The judgment of the Family Court must be affirmed when the inferences and deductions upon which it is based are supported by the record and are the product of an orderly and logical deductive

[5] *Id.* at 30 (Del. Fam. Ct. June 26, 2023) (citing *Transperfect Global, Inc. v. Pincus*, 278 A.3d 630, 644–45 (Del. 2022); *In re Hurley*, 257 A.3d 1012, 1018 (Del. 2021)).
[6] *Id.* at 31.
[7] *Long v. Div. of Family Servs.*, 41 A.3d 367, 370 (Del. 2012).
[8] *Id.*
[9] *Mundy v. Devon*, 906 A.2d 750, 752 (Del. 2006).
[10] *Dawson v. Dawson*, 2020 WL 236636, at *2 (Del. Jan. 14, 2020).

process."[11] If the Family Court correctly applied the law, then our standard of review is abuse of discretion.[12]

(12) Father argues that the Family Court erred by considering only whether continued enforcement of the 2021 Order would endanger the Child's physical health or significantly impair his emotional development, rather than applying a best-interests analysis. The "overriding policy purpose" of Delaware's laws governing child custody, placement, and visitation is to "provid[e] stability and continuity in the child's home life" by "provid[ing] for the best interests of the child on a continuing, but non-disruptive, basis."[13] In furtherance of this goal, the Delaware Code establishes various standards for the Family Court to apply to petitions to modify its prior orders. Determining the applicable standard depends upon (i) how much time has passed since entry of the prior order, (ii) which aspect of the arrangement—custody, primary residence, or visitation—the petition seeks to modify, and (iii) whether the prior order was entered by consent or after a full hearing on the merits.

---

[11] *Mundy*, 906 A.2d at 752–53.
[12] *Jones v. Lang*, 591 A.2d 185, 186 (Del. 1991).
[13] *Friant v. Friant*, 553 A.2d 1186, 1189, 1191 (Del. 1989) (internal quotation omitted); *see also Bates v. Bates*, 2015 WL 2147191, at *1 n.2 (Del. May 6, 2015) (quoting *Friant* for the proposition that "courts should be careful not to unsettle custody matters affecting a child's life too frequently because of the 'overriding policy purpose of the Delaware child custody laws, *i.e.*, to provide for the best interests of the child on a continuing, *but non-disruptive*, basis'" (emphasis in *Bates*)).

(13)    When a party files an application for modification (i) within two years of a prior order that (ii) concerns legal custody or the child's primary residence, and (iii) was entered after a full hearing on the merits, Section 729(c)(1) provides that the Family Court shall not modify the prior order "unless it finds, after a hearing, that continuing enforcement of the prior order may endanger the child's physical health or significantly impair such child's emotional development."[14]    Section 729(c)(1) therefore establishes a "heightened standard," as compared to the best-interests standard, for such petitions.[15]

(14)    Under 13 *Del. C.* § 729(a), "[a]n order concerning visitation may be modified at any time if the best interests of the child would be served thereby in accordance with the standards set forth in § 728(a) of this title."[16]    Section 728(a) provides:

> The Court shall determine, whether the parents have joint legal custody of the child or 1 of them has sole legal custody of the child, with which parent the child shall primarily reside and a schedule of visitation with the other parent, consistent with the child's best interests and maturity, which is designed to permit and encourage the child to have frequent and meaningful contact with both parents unless the Court finds, after a hearing, that contact of the child with 1 parent would endanger the child's physical health or significantly impair such child's emotional development.  The Court shall specifically state in any order denying

---

[14] 13 *Del. C.* § 729(c)(1); *Brown v. Branch*, 2016 WL 6156194, at *2 (Del. Oct. 21, 2016).
[15] *See Gonzalez v. Devlin*, 792 A.2d 188, 2002 WL 272327, at *2 (Del. Feb. 20, 2002) (TABLE) ("[w]hile this 'heightened standard' applies to petitions for modification filed within two years of the prior order, the 'best interests of the child' standard applies to petitions for modification filed beyond the two-year period.").
[16] 13 *Del. C.* § 729(a).

9

or restricting a parent's access to a child the facts and conclusions in support of such a denial or restriction.[17]

Section 722 sets forth factors for the court to consider when determining the best interests of a child.[18]

(15) The Family Court applied the correct standard in this case. Mother's petition sought to modify the 2021 Order, which was entered after a hearing on the merits less than two years earlier. Under the 2021 Order, the parties had joint legal custody; Mother had primary residential placement during the school year and the parties had shared placement during the summer; and Father had weekend visitation during the school year. Mother sought to eliminate Father's contact with the Child— that is, she sought to modify the residential placement and visitation provisions of the prior order by obtaining primary placement for the full year and eliminating Father's visitation. Accordingly, under Section 729(c)(1), the Family Court was required to make a "threshold determination that continuing enforcement of the prior custody/residential placement order may endanger the child's physical health or significantly impair his . . . emotional development."[19] Then, because Mother sought an arrangement that would eliminate or severely restrict Father's contact with the

---

[17] *Id.* § 728(a).
[18] *Id.* § 722(a).
[19] *Tatum v. Yost*, 931 A.2d 438, 2007 WL 2323791, at *2 (Del. Aug. 15, 2007) (TABLE).

10

Child, the same heightened standard applied to the court's determination of what contact Father should have going forward.[20]

(16) Father cites this Court's decision in *Tatum v. Yost*[21] in support of his argument that the Family Court erred by not conducting a best-interests analysis. In *Tatum*, the prior order provided the father with primary residential placement of the parties' children and the mother with visitation; the mother sought modification to provide "full custody and residential placement" for the mother and "liberal visitation" for the father or, in the alternative, shared residential placement.[22] This Court held that the Family Court erred by modifying the prior order without explicitly applying the best-interests factors.[23] Under the circumstances in *Tatum*, after the court determined under Section 729(c) that the prior order should be modified, the best-interests standard governed the determination of which parent should be awarded primary residential placement.[24] In contrast, Mother sought an

---

[20] *See* 13 *Del. C.* § 728(a) (providing that the court shall determine "with which parent the child shall primarily reside and a schedule of visitation with the other parent, consistent with the child's best interests and maturity, which is designed to permit and encourage the child to have frequent and meaningful contact with both parents unless the Court finds, after a hearing, that contact of the child with 1 parent would endanger the child's physical health or significantly impair such child's emotional development"); *see also id.* § 729(a) ("[a]n order concerning visitation may be modified at any time if the best interests of the child would be served thereby in accordance with the standards set forth in § 728(a) of this title.").

[21] 931 A.2d 438, 2007 WL 2323791 (Del. Aug. 15, 2007) (TABLE).

[22] *Id.* at *1.

[23] *Id.* at *2–3.

[24] *See id.* at *2 ("[w]hen deciding residential custody, or when otherwise making a substantial change in a child's living arrangement, the Family Court is required to determine what is in the best interests of the child." (citing 13 *Del. C.* § 722)); *see also Bordy v. Radia*, 2020 WL 4360785, at *2 (Del. Aug. 5, 2020) (affirming Family Court decision that modified, within two years, a prior

order that would not permit Father to have frequent and meaningful contact with the Child. The Family Court therefore did not commit reversible error by applying the "heightened standard"[25] that required Mother to prove that contact with Father would "endanger the child's physical health or significantly impair [his] emotional development."[26]

(17) Father next argues that the Family Court erred by denying Father's motion for recusal. On November 4, 2022, Father filed a motion arguing that none of the Family Court judges and commissioners in Sussex County should have any further contact with the case because every decision of the court since the parties began litigating in 2009 allegedly reflected bias. The Family Court judge applied Rule 2.11(A) of the Delaware Judges' Code of Judicial Conduct and *Los v. Los*[27] and denied the motion, finding that she did not have any subjective bias or prejudice

---

order under which placement of the children alternated weekly between the father and the mother, who lived in different states, to provide for primary residential placement with the mother and standard visitation with the father, after applying 13 *Del. C.* § 729(c)(1) and the best-interests factors).

[25] *See Gonzalez*, 2002 WL 272327, at *2 (describing the standard requiring a showing of endangerment of physical health or significant impairment to emotional development as a "heightened standard" as compared to the best-interests standard).

[26] 13 *Del. C.* § 728(a); *see also id.* at § 729(a) (permitting modification of an order concerning visitation at any time "if the best interests of the child would be served thereby in accordance with the standards set forth in § 728(a) of this title").

[27] 595 A.2d 381 (Del. 1991).

against Father and that he had not alleged facts that created an objective appearance of bias.[28]

(18) When deciding whether recusal is appropriate, a trial judge must undertake the two-step analysis set forth in *Los*. That analysis includes both a subjective and an objective test. First, the judge must determine whether she is subjectively satisfied that she can hear the case free of bias or prejudice concerning the party seeking recusal.[29] Second, if the judge subjectively believes that she has no bias, the judge must determine whether there nevertheless is an appearance of bias sufficient to cause objective doubt as to the judge's impartiality.[30] On appeal, this Court reviews the judge's analysis of the subjective test for abuse of discretion and reviews application of the objective test *de novo*.[31]

(19) In its order denying the motion for recusal, the Family Court judge cited *Los* and concluded that she was satisfied that she could proceed with the case free of bias or prejudice and that there was no appearance of bias sufficient to cause doubt

---

[28] The Family Court judge denied the motion as moot to the extent that it argued for recusal of judges that had presided over past matters and deferred to the commissioners to the extent that the motion sought their recusal in matters to which the commissioners were assigned.

[29] *Los*, 595 A.2d at 384–85.

[30] *Id.* at 385. *See also Gattis v. State*, 955 A.2d 1276, 1281 (Del. 2008) ("The first step requires the judge to be subjectively satisfied that she can proceed to hear the cause free of bias or prejudice concerning that party. Even if the judge is satisfied that she can proceed to hear the matter free of bias or prejudice, the second step requires the judge to examine objectively whether the circumstances require recusal because there is an appearance of bias sufficient to cause doubt as to the judge's impartiality." (quoting *Jones v. State*, 940 A.2d 1, 18 (Del. 2007))).

[31] *Gattis*, 955 A.2d at 1281, 1285.

as to the judge's impartiality. The record does not support a conclusion that the Family Court judge abused her discretion by finding that she was not subjectively biased, nor do we find an objective appearance of impropriety.[32] We therefore affirm the Family Court's denial of the motion for recusal.

(20) Finally, after careful consideration of the record, we have determined that the Family Court's factual findings were supported by the record and that the court did not abuse its discretion by determining that Father's future contact with the Child should occur in a therapeutic setting. The teenaged Child testified at Father's request and expressed his fear of having contact with Father, and Dr. Turley's testimony corroborated the Child's testimony. Moreover, Dr. Turley testified that immediate, unsupervised contact with Father would likely "vastly accelerate" the Child's emotional fears and opined that reintroducing contact between Father and the Child should occur in a "therapeutic environment," such as a program of "reunification therapy."[33] "When the determination of facts turns on a question of the credibility and the acceptance or rejection of the testimony of witnesses appearing before the trial court, we will not substitute our opinion for that of the trier of fact."[34] Father's disagreement with the Family Court's factual findings is not a

---

[32] *Cf. Tower v. Fowler*, 220 A.3d 257, 2019 WL 5095825, at *2 (Del. Oct. 10, 2019) (TABLE) ("The fact that Tower disagrees with the court's factual findings is not a basis for reversal and the record does not support Tower's contention that the Family Court's decision was the result of the judge's bias or prejudice.").
[33] Transcript of April 26, 2023 Hearing, at 165–67.
[34] *Tower*, 2019 WL 5095825, at *2.

14

basis for reversal.[35] The record contains sufficient evidence, including the Child's testimony and that of his therapist, to support the Family Court's determination that continued contact with Father as provided in the 2021 Order would significantly impair the Child's emotional development and that Mother was not in contempt of the 2021 Order.[36]

(21) We therefore conclude that the Family Court's decision should be affirmed. To the extent that Father and the Child have made therapeutic progress toward reunification, "[a]n order concerning visitation may be modified at any time if the best interests of the child would be served thereby in accordance with the standards set forth in § 728(a) of this title."[37]

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is AFFIRMED.

BY THE COURT:

*/s/ Abigail M. LeGrow*
Justice

---

[35] *Id.*
[36] *Brown v. Branch*, 150 A.3d 275, 2016 WL 6156194, at *4 (Del. Oct. 21, 2016) (TABLE).
[37] 13 *Del. C.* § 729(a).

15